GINA A. STEWARD, Appellant, *v.* ALLEN STEWARD, SR., and MARY ANN STEWARD, Respondents.

No. 24563

March 2, 1995

890 P.2d 777

296 ·

*William O. Voy,* Las Vegas, for Appellant.

*Allen Steward, Sr.,* and *Mary Ann Steward,* In Proper Person, for Respondents.

## OPINION

*Per Curiam:*

Appellant Gina A. Steward (Gina) and Allen Steward, Jr. (Allen) are divorced, but have joint legal and physical custody of their minor child, Matthew Steward (Matthew). They were in agreement that Allen's parents, respondents Mary Ann Steward and Allen Steward, Sr. (collectively, the Stewards), should not see Matthew. This decision was based on Mary Ann's erratic and abusive behavior towards Gina and Allen, and on instances in which the Stewards failed to properly care for Matthew when he was left with them. Pursuant to NRS 125A.340, the Stewards

petitioned for and were granted visitation with Matthew, despite the recommendation of a child custody specialist that no visitation should occur. Gina appeals. For the following reason, we reverse the district court order granting visitation to the Stewards.

## FACTS

On October 6, 1989, Gina and Allen Steward were divorced. Gina and Allen have joint legal and physical custody of their minor child, Matthew. On June 20, 1991, Allen's parents, the Stewards, filed a petition to establish visitation with Matthew, who was three years old at that time. They claimed that Allen and his new girlfriend had been "shutting the grandparents out of contact with Matthew," and that it was in Matthew's best interest to see them.

Gina and Allen each filed an opposition to the petition, asserting that it was not in Matthew's best interest for the Stewards to exercise visitation.

In her affidavit, Gina claimed that the Stewards had shown no love or affection towards Matthew, and that Mary Ann had threatened to take Matthew away from Gina and Allen. Additionally, she stated that Mary Ann tried to break up her and Allen's marriage. Gina described an incident in August of 1988, where Gina and Allen let Mary Ann take Matthew for the night because Mary Ann was threatening to kill herself if they refused. When they called to see how Matthew was doing, Mary Ann yelled obscenities and hung up on them. The next day when the Stewards returned Matthew, he had chocolate ice cream all over his face and his diapers had not been changed all night, giving him a terrible rash. Gina also stated that Mary Ann was a heavy gambler who would stay away from home for two or three days at a time. She claimed that Mary Ann is bringing this action in an attempt to control Allen's life and to hurt her.

Gina's mother and father submitted affidavits in support of Gina's opposition to the Stewards' petition for visitation. Gina's mother stated that Mary Ann has threatened to kill both her husband and her son, and noted that when Gina was pregnant Mary Ann called her a "whore" and told her she hoped she would miscarry. Gina's father, who has known Mary Ann since 1947, described how Mary Ann created problems in his own marriage by falsely convincing his family that he and Mary Ann were having an affair. He feels that Mary Ann is an insane, dangerous, and conniving individual.

In his affidavit, Allen stated that when he had allowed the Stewards to take Matthew overnight in the past, they always returned him at 6:00 or 7:00 in the morning, telling him that they "couldn't take it anymore." Additionally, Allen stated that Mary

Ann has a terrible gambling problem and is suicidal and unstable. Allen feels that his parents are trying to "poison [Matthew] against [him]." Allen further stated, "even though my ex-wife Gina and myself had a difficult divorce, we are strongly united in our feelings that Matthew should not have visitation with my parents."

On July 23, 1991, based on these affidavits, a domestic relations referee recommended a temporary restraining order against the Stewards, prohibiting them from having any contact with Matthew except by telephone.

On November 25, 1991, a child custody specialist hired by the district court issued a report. The specialist's report describes Allen's feeling that his mother broke up his relationship with Gina, and was attempting to do the same thing with his current girlfriend, Angelyn. He and Angelyn had moved to California to get away from her, and did not want Mary Ann to know their address.

Allen's sister submitted a letter to the custody specialist describing her mother's terrible gambling problem, and the way in which Mary Ann had alienated all of her family members through her erratic and abusive behavior.

In her conclusion, the child custody specialist described the interaction in the family as dysfunctional and destructive, noting:

> The question then for the Court is the extent to which Matthew can, or should, be protected from the dysfunctional relational pattern of the family and whether or not contact with Mary Ann is detrimental to his well-being. There are several factors to be considered. First, although Mary Ann seems to have a relationship with Matthew, the quality of the relationship was not easily determined. It was clear that he was ambivalent about her, and while he was initially enthusiastic about seeing her, he became very uncomfortable as the visit progressed and did not want to stay.

> There are also some problems related to Mary Ann's behaviors that could cause difficulty for Matthew. There is the question of the aggressiveness reported by Gina and Allen and that observed by this specialist. While this aggressiveness was not clearly documented as being related to Mary Ann, the findings suggest its possibility given the reports of Matthew being out of control. The question of Mary Ann's gambling is also a factor if Matthew is to be in her care for any extended period of time. Although she insisted that her problem was in the past, the findings show that her problem was severe enough to warrant extensive professional intervention. There were [sic] no indication such intervention has occurred.

The primary problem related to behavior, however, relates to the reported unpredictable outbursts of anger by Mary Ann. The findings show that the outbursts intimidated those who experienced them and suggest they intimidate Matthew, as well. The findings also suggest the strong possibilty [sic] that Matthew would not be excluded from the kind of tale carrying which Mary Ann has acknowledged and which has precipitated many of the family quarrels.

Finally, the question emerges as to how beneficial Matthew's contact with Mary Ann can be, given the strong opposition of both his parents. While Mary Ann may have the right to have contact with her grandchild, both parents' strong opposition should probably be considered given their unity on the matter. Therefore, given the patterns of communication and the inability of family members to take responsibility for their own behavior, it does not appear to be in Matthew's best interest at this time to be exposed to the intra-family conflicts that show no indication of abating.

In response to the domestic relations referee's request for clarification of the conclusions of the report of November 25, 1991, the child custody specialist stated that the "primary recommendation of the study is that visitation not occur."

Pursuant to the Stewards' request, an evidentiary hearing was held at which time Gina and the specialist reiterated their earlier statements. Mary Ann testified that after Allen and Gina's divorce, Allen moved in with the Stewards. She stated that during this time, her son had visitation 50 percent of the time, and that consequently, the Stewards had a lot of contact with Matthew. She said that after Allen moved away from their house and in with Angelyn nine months later, this changed.

Allen testified that the only reason he moved in with his parents was because he could not afford to live on his own right after the divorce. He stated that during the time he and Matthew lived with his parents, he worked a graveyard shift, so that Matthew was sleeping while he was at work. Allen, Sr., watched Matthew when Allen was not able to because Mary Ann "couldn't handle it." Allen stated that when Matthew was sick during this time, Mary Ann told him that it was not her responsibility to watch a sick child. He said that when Angelyn brought over some medicine, Mary Ann refused to administer it. Allen reiterated that he does not love his parents, that he moved to California to get away from them, and that he does not want them to have any contact with Matthew.

The referee found that: (1) the family is dysfunctional and Mary Ann has attempted to control family members; (2) it is

highly unusual that even after an acrimonious divorce proceeding, both natural parents would represent a united opposition to one set of grandparents exercising any contact with the minor child; and (3) despite the bitterness between the parties, the Stewards "took in" Allen and the minor child after the divorce and assumed "significant responsibility in raising that minor."

By order dated January 21, 1993, the referee recommended that the Stewards take a parenting course, and that they enroll in counseling specifically addressing the issues raised in this case. The referee further recommended that, at the therapist's discretion, the Stewards should be awarded unsupervised contact with Matthew on a graduated basis, with the ultimate goal being visitation for one Saturday or Sunday per month, one week during summer vacation, two consecutive days during Christmas vacation, and one phone call per week.

Both Gina and Allen filed objections to the referee's report. On March 4, 1994, the district court held a hearing. The district court noted that the referee had heard testimony and was familiar with the case. The court further stated that it believed the grandparents should have visitation, and that it did not find that the referee's recommendation constituted an abuse of discretion. The district court therefore affirmed the referee's recommended visitation schedule. Gina appeals.

## DISCUSSION

*Whether NRS 125A.340 should be interpreted to permit grandparent visitation over the objection of natural parents with full legal rights to their children.*

Gina contends that the district court erred in granting the Stewards visitation over the objection of both parents because NRS 125A.340[1] was not intended by the legislature to permit grandparents the right to seek judicially imposed visitation over the objection of natural parents with full legal rights to their children.

This is a case of first impression, as the court has not yet had

---

[1]NRS 125A.340 states:

> Except as otherwise provided in subsection 2 of NRS 125A.330, a grandparent or parent of either parent of an unmarried minor child, if:
> 1. One parent of the minor child is deceased, divorced or separated from the other parent; or
> 2. The parental rights of either parent have been terminated, may visit the child during the child's minority and spend sufficient time with the child to establish a meaningful relationship, if the court determines that visitation is in the best interests of the child.

the opportunity to interpret NRS 125A.340. A vast number of states, however, have statutes which provide grandparents with the right to obtain judicially compelled visitation with their minor grandchildren. Some state statutes specifically prevent visitation over the objection of both parents. *See* Ind. Code § 31-1-11.7-3 (1993); Miss. Code Ann. § 93-16-1 (1993); Vt. Stat. Ann. tit. 15, § 1012 (1993); W. Va. Code § 48-2B-2 (1993). Courts in several states in which the grandparent visitation statute is silent on this issue have ruled that the legislature did not intend to permit grandparents the right to judicially compelled visitation over the objection of both parents, or over the objection of their own child.

In Olds v. Olds, 356 N.W.2d 571 (Iowa 1984), the maternal grandparents sought visitation rights with respect to the grand-children whose custody had been awarded to their daughter through a divorce decree. The Iowa statute at issue allowed the grandparents to petition for visitation rights when the parents of the child were divorced. *Id.* at 573. In concluding that the trial court lacked authority to award visitation under these circum-stances, the court found that the legislature did not intend the statute to apply where the grandparents seek visitation over the objection of the custodial parent who is their own child, reason-ing:

> The common law rule against coercing grandparent visita-tion over parental objection demonstrates a respect for fam-ily privacy and parental autonomy. . . . It also recognizes that the parenting right is a fundamental liberty interest that is protected against unwarranted state intrusion. *See Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 1394, 71 L. Ed. 2d 599, 606 (1982).

*Olds*, 356 N.W.2d at 574.

The court went on to explain the legislative purpose and the derivative nature of the grandparental rights, stating:

> [The statute] was enacted to ameliorate the harshness of the common law in situations where grandparents could not seek derivative visitation rights from the parent who is their child. In those situations some event has taken the grandchil-dren from the custody of the parent from whom the grand-parents would normally receive access to their grandchildren. The statutory exceptions thus presuppose a disruption of the family unit that deprives the grandparents of that natural avenue for seeking visitation. They envision a dispute over visitation between the grandparents and a custo-dian of the children who is not the child of the grandparents. The statute does not provide a means for court intervention,

however, when the dispute is between the grandparents and a custodial parent who is their child.

*Id.*

In the Matter of the Adoption of A Child by M., 355 A.2d 211 (N.J. Super. Ct. Ch. Div. 1976), the New Jersey Superior Court was faced with a statute similar to NRS 125A.340. In denying visitation rights to the parents of the noncustodial parent who had visitation rights, the court reasoned:

> [I]t would seldom, if ever, be in the best interests of the child to grant visitation to the grandparents when their child, the parent, has such rights. The court need not go so far as to say that the statute should be interpreted as not permitting such right. But visitation by grandparents should be derivative; otherwise the child might have four, or even six people competing for his company: father, mother, paternal grandparents and maternal grandparents.

*In the Matter of the Adoption of A Child by M.*, 355 A.2d at 213.

Relying on the reasoning of such cases, Gina argues that permitting the Stewards to maintain visitation over the objection of Matthew's natural and custodial parents is unreasonable, is not in Matthew's best interest, and should not be found to be consistent with the legislative intent in enacting NRS 125A.340.

It is well established that the court must interpret statutes consistent with the intent of the legislature. *See* Recanzone v. Nevada Tax Comm'n, 92 Nev. 302, 305, 550 P.2d 401, 403 (1976). In addition, the court must ascribe an intent which will accomplish a reasonable result. Rose v. First Federal Savings & Loan, 105 Nev. 454, 457, 777 P.2d 1318, 1320 (1989). When interpreting a statute, any doubt as to legislative intent must be resolved in favor of what is reasonable, as against what is unreasonable, so as to avoid absurd results. Cragun v. Nevada Pub. Employees' Ret. Bd., 92 Nev. 202, 205, 547 P.2d 1356, 1358 (1976).

Gina contends that in drafting NRS 125A.340, the legislature could not reasonably have intended to grant standing to grandparents to seek judicially compelled visitation with their minor grandchildren when both natural parents having full legal rights to the child object to such visitation.

The legislative history shows that in 1987 NRS 123.123[2] was

---

[2] NRS 123.123 stated, in pertinent part:

 1. If a parent of an unmarried minor child is deceased or divorced or separated from the parent who has custody of the child, or his parental rights have been relinquished or terminated, the district court in the county in which the child resides may grant to the grandparents,

amended and transferred to NRS 125A.340. In enacting NRS 125A.340, the requirement that the grandparent/petitioner be the parent of either the noncustodial parent or a deceased parent was deleted, conceivably allowing a grandparent to seek visitation rights over the objection of both parents, including the objection of his or her own child.

The bill which created NRS 125A.340, as originally proposed, would have allowed grandparents to seek visitation even when the natural parents were still married. There were, however, numerous objections to state interference with intact marriages.[3] In response to this concern, the bill was amended to allow for court intervention only when the natural parents were divorced. Minutes of the Senate Committee on Judiciary, June 5, 1987 at 12.

As Gina argues, in enacting NRS 125A.340 in its present form, the legislature considered so-called "egregious circumstances" which the statute was designed to remedy. Minutes of the Senate Committee on Judiciary, June 4, 1987 at 3-7. These "egregious circumstances" consisted of situations where grandparents needed to have standing with social services when the parents were somehow unfit and the grandparents wanted to have legal rights to step in and help; where the grandparents had been the sole legal guardian of the grandchild for years at a time (due to the parents' inability or lack of desire to care for the child) and were later prohibited from seeing the grandchild; and where parents had had their parental rights terminated and therefore, the grandparents had lost visitation with the grandchildren. *Id.* None of the "egregious circumstances" that were described involved fit parents with full legal rights who had never relinquished responsibility for or custody of the child.

Accordingly, we interpret NRS 125A.340 to set up a presump-

---

parents and other children of the parent who is deceased or divorced or separated from the parent who has custody of the child or whose parental rights have been relinquished or terminated, a reasonable right to visit the child during his minority . . . .

[3]In attempting to convince the Senate Committee on Judiciary to accept this version of the amendments, Assemblyman Gaston stated:

"The objection to this bill was regarding the 'in tact' family . . . the objection was this would interfere with the 'in tact' family and meddle into something that is none of their business and only cause problems. Being a practitioner in law, I know these cases, under our present statute, are very rare. . . . I have two cases in eight years of practice . . . many attorneys have never had a case, so they are very rare, and I tried to explain to individuals that this is not going to come up except in very egregious circumstances . . . ."

Minutes of the Senate Committee on Judiciary, June 4, 1987 at 3.

The testimony that followed directed the legislators' attention to these so-called "egregious circumstances," none of which involved parents with full legal rights to their children who had never abdicated parental responsibility. *See id.* at 3-7.

tion against court-ordered grandparental visitation when divorced parents with full legal rights to the children agree that it is not in the child's best interest to see the grandparents. Absent the presentation of clear and convincing evidence showing otherwise, the court should not interfere with the decision of the natural parents.

Interpreting the statute otherwise would have the absurd result of permitting the state to intrude solely because the parties are divorced, regardless of the fact that both parents are in agreement as to what was in the best interests of their child, and regardless of the fact that both parents have full legal rights to the child and have never abdicated their parental responsibility. Additionally, any other interpretation would undermine the natural parents' liberty interest in the care, custody, and management of their children. *See* Santosky v. Kramer, 455 U.S. 745, 753 (1983); Smith v. Smith, 102 Nev. 263, 720 P.2d 1219 (1986).

*Whether the district court's determination that visitation was in Matthew's best interest is supported by substantial evidence.*

Though NRS 125A.340 does not list factors to be considered in determining the best interest of the child, NRS 125A.330, which provides visitation rights for certain relatives (including grandparents), does provide such factors.[4] The evidence in the record

---

[4]NRS 125A.330 states, in pertinent part:

In determining whether to grant this right to a petitioner, the court shall consider:

(a) The love, affection and other emotional ties existing between the party seeking visitation and the child.

(b) The capacity and disposition of the party seeking visitation to:

(1) Give the child love, affection and guidance;

(2) Cooperate in providing the child with food, clothing and other material needs during visitation; and

(3) Cooperate in providing the child with health care or alternative care recognized and permitted under the laws of this state in lieu of health care.

(c) The prior relationship between the child and the party seeking visitation.

(d) The moral fitness of the party seeking visitation.

(e) The mental and physical health of the party seeking visitation.

(f) The reasonable preference of the child, if the child has a preference, and if the child is determined to be of sufficient maturity to express a preference.

(g) The willingness and ability of the party seeking visitation to facilitate and encourage a close and continuing relationship between the child and the parent or parents.

(h) The medical and other needs of the child related to health as affected by the visitation.

(i) Any other factor considered relevant by the court to a particular dispute.

indicates that under an evaluation based on these factors, ordering visitation with the Stewards was not in Matthew's best interest.

First, the child custody specialist's report did not find a strong emotional tie existing between Matthew and his grandparents, and in fact noted that Matthew seemed "ambivalent" about Mary Ann, wanted their visits to end, and exhibited aggressiveness that may have been prompted by her. Second, there was extensive testimony in the record regarding the inability of the Stewards to properly care for Matthew. Third, Mary Ann's mental stability and moral character are hardly exemplary given her treatment of both Gina and Allen, her threats of suicide, her gambling problem, and her acknowledged penchant for spreading lies.

Additionally, as the specialist noted, given Mary Ann's past conduct, visitation with her would draw Matthew into "intrafamily conflict" that certainly cannot be considered to be in his best interest. Furthermore, both Gina and Allen assert that Mary Ann is responsible for their divorce, and Allen feels that the Stewards are trying to "poison" Matthew against him, all of which indicates that the Stewards would not facilitate a close relationship between Matthew and his parents. Thus, the Stewards do not meet any of the requirements for a showing that visitation would be in Matthew's best interest.

The referee ignored not only the parties' testimony, showing that the factors describing "best interest" were not met, but also the clear recommendation of the child custody specialist that no visitation be allowed. Instead, the referee seemingly relied on the fact that Allen lived with his parents for six to nine months, finding that the Stewards "took in" Matthew and Allen and "assumed a significant amount of responsibility" for Matthew. The testimony at the evidentiary hearing, however, does not support this conclusion. The referee's characterization of the Stewards as having generously "taken in" Matthew and Allen fails to take account of the fact that Allen's divorce and resulting inability to live on his own was in large part due to Mary Ann's behavior. Additionally, Allen testified regarding Mary Ann's unhelpfulness and inability to care for Matthew during the time they stayed with the Stewards.

It appears that the district court failed to adequately review the record, and instead simply deferred to the referee's report. Moreover, the district court failed to address any of the issues that Allen and Gina raised in their written objections to the referee's report and in the oral arguments thereon. The Stewards failed to present any evidence, let alone the requisite clear and convincing evidence, showing that visitation would be in Matthew's best interest given the decision of Matthew's parents. Accordingly,

the district court's order granting the Stewards visitation with Matthew is reversed.