**Wendy Kalinec LILLEY, Appellant,**

**. v.**

**William Rayford LILLEY, Appellee.**

**No. 03–00–00284–CV.**

Court of Appeals of Texas,
Austin.

April 12, 2001.

Peter R. Meeker, Davis & Wilkerson, P.C., Austin, for appellee.

Cathy L. Bradford, Austin, for appellant.

Before Chief Justice ABOUSSIE, Justices B.A. SMITH and PATTERSON.

BEA ANN SMITH, Justice.

The district court signed an order granting appellee William Rayford Lilley ("Ray") scheduled visitation with his granddaughter, who is the daughter of appellant Wendy Lilley. Wendy appeals from the final visitation order, attacking the factual sufficiency of the evidence supporting the order and contending the order violates her due process rights under the United States Constitution. We will affirm.

## Factual Background

Wendy was married to Clay Lilley and they had a daughter, S.M.L., born on May 15, 1997. In February 1998, while Clay and Wendy were seeking a divorce, Clay committed suicide. Ray is Clay's father and S.M.L.'s paternal grandfather. Ray initially blamed Wendy for Clay's suicide. Two months after Clay's death, Ray filed a petition requesting "reasonable access" to his granddaughter. A pretrial hearing was held in June 1998, and an associate judge signed temporary orders allowing Ray supervised visits with S.M.L. on the first and third Saturdays of each month until S.M.L.'s second birthday and unsupervised visits after her second birthday, conditioned on Ray's seeking grief or anger-management counseling.

During the summer of 1998, Ray sought counseling, and trial testimony indicates he and Wendy worked out a visitation schedule that greatly exceeded the terms of the temporary orders. A final hearing was held on January 5, 2000, and the district court granted Ray possession of S.M.L. one weekend each month, one week in the summer, two days between Christmas and New Year's Day, and every other Father's Day. The district court found it would be in S.M.L.'s best interest for Ray to have access to her. Wendy appeals, arguing the visitation order is against the great weight and preponderance of the evidence and violates her due process rights.

## Discussion

Under certain circumstances, a grandparent may petition a trial court for access to a grandchild. Tex.Fam.Code Ann. § 153.433 (West Supp.2001). Section 153.433 provides that a trial court shall allow the grandparent reasonable access to the grandchild if such access is in the best interest of the grandchild and the grandparent's child is a parent of the grandchild and is deceased. *Id.* § 153.433(2)(A).

A trial court has wide discretion in determining the best interest of a child in family law matters such as custody, visitation, and possession. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex.1982); *G.K. v. K.A.*, 936 S.W.2d 70, 72 (Tex. App.—Austin 1996, writ denied); *see Dennis v. Smith*, 962 S.W.2d 67, 68 (Tex. App.—Houston [1st Dist.] 1997, pet. denied). We will reverse a trial court's order only if it appears from the entire record that the trial court abused its discretion, meaning it acted unreasonably, arbitrarily, or without reference to any guiding principles. *G.K.*, 936 S.W.2d at 72. There is no abuse of discretion if the decision is supported by sufficient, competent evidence. *Gillespie*, 644 S.W.2d at 451; *Dennis*, 962 S.W.2d at 68. That a trial court decides an issue differently than would an appellate court does not demonstrate an abuse of discretion; often a trial court is in a better position to evaluate evidence and the child's best interest. *Wright v. Wright*, 867 S.W.2d 807, 816 (Tex.App.—El Paso 1993, writ denied). The trial court, as fact-finder, resolves conflicts in the evidence and determines the weight and credibility to give to witness testimony. *Schneider v. Schneider*, 5 S.W.3d 925, 931 (Tex.App.—Austin 1999, no pet.). A fact-finder's decision on conflicts in the evi-

dence is generally viewed as conclusive. *Id.*

In her first issue on appeal, Wendy contends that the district court's order was against the great weight and preponderance of the evidence and thus manifestly unjust. She argues that giving Ray grandparent access is not in S.M.L.'s best interest because Ray is unfit to be in a position of authority over S.M.L. and because of the animosity that has developed between Ray and Wendy.

■ Ray lives in Houston; Wendy and S.M.L. live in Austin. Ray is fifty years old, in good health, and married to his third wife. He has one living child, a daughter, and three stepchildren. Ray said he had assisted Wendy financially and helped pay for S.M.L.'s day care. He testified he received funds from a life insurance policy he owned insuring Clay's life and established a trust fund with those proceeds; when he dies, S.M.L. will have access to the fund monies. Ray said he thought taking S.M.L. to Houston on weekends was in her best interest because it allowed her to see her father's family; he thought it also gave Wendy a break and allowed her to get things done. When S.M.L. visits, Ray brings her to visit his elderly mother in Cleveland or other family members. Ray's daughter sees S.M.L. "[w]henever [Ray] has her," and has only seen her niece three or four times outside Ray's presence. Ray's mother, S.M.L.'s great-grandmother, has seen S.M.L. four times, always during Ray's visits.

At the pretrial hearing, Ray admitted that he blamed Wendy and himself for Clay's suicide. He also admitted that he left the following message on Wendy's answering machine in December 1997, while she and Clay were divorcing:

I've left two messages. So if you can return my call like you said you was going to do—but don't think you want

me to come to Austin. I'm not on these restraining orders and if you deny this baby the right to see his father during Christmas, me and you got a problem. You're going to have to deal with me. That's not a terroristic threat, that's a promise.

Ray said, "Yes, sir, I said that. I don't think he's dealing with it now because my son is now deceased and I knew that's what was going to happen."

At the final hearing, Ray testified he had gone to counseling and was no longer angry at Wendy over his son's death. Asked about the counseling, Ray said, "I don't know if you're calling that anger management course what the psychologist gave me or not, you'll have to ask the psychologist. I have no anger. So I think I've come a long ways from the first day we were in court, and I'm not angry at anyone." He said he saw the psychologist a number of times in the summer of 1998 and had gone back once since then. At the final hearing, he testified that in the year and a half since the pretrial hearing, he and Wendy had been cooperating and getting along fine.

When asked why he filed his petition less than a month after his son's death, Ray said he thought "everything was beautiful," and "[a]ll [he] wanted was something that was in writing from the Court so there would be something in writing, concrete." Ray was asked whether he had threatened to take Wendy to court if she did not cooperate with him. He responded,

That was in the very beginning, sir, you're taking this way out of context. . . . We were just trying to get some stuff written in court papers so that it was legal so that if anything ever happened in the future, she got married or we got to where we wasn't getting

along, we would have something concrete as far as visitation.... And I'm sorry, maybe I should have brought my wife and family because I thought me and Wendy were getting along fine.

Ray said his relationship with his daughter was "fine," he got along well with Clay before his death, and he had "great" relationships with his stepsons. Ray denied there was any family violence in his first marriage and admitted there was some violence in his second marriage. He said Child Protective Services was called to his house once about eight years earlier because his daughter spit in his face and he hit her. He denied mentally abusing his second wife, but said she would probably say he had abused her. He said he physically abused his daughter once or twice, and physically abused Clay once.

Wendy testified about an incident that occurred after she and Clay decided to divorce and Clay had moved out of their house. Clay and Ray came to the house together and threatened to kick the door down. Wendy moved to Austin after Clay moved out because she was scared of Ray and Clay. Wendy testified that "[t]he divorce got very nasty," Clay threatened to kill her, and she got a restraining order against him. She said Clay had very little contact with S.M.L. from late November 1997 until his death in February 1998. Immediately after Clay's suicide, Ray told Wendy the suicide was her fault.

Wendy said Ray intimidated her into agreeing to visits by telling her he had the financial means to fight her in court and she did not. She said Ray had made what she believed were veiled threats to kidnap S.M.L. when he told her his passport and visa were current. She said when she disagrees with Ray while they are trying to arrange visitation, he tells her he will take her to court, which she cannot afford. She testified that she had never denied Ray visits with S.M.L. and did not intend to do so.

Wendy said Ray offered to help her financially if she agreed to his visitation demands. He offered to pay off her and Clay's tax debt, give her a car, pay her credit card debts, and establish a college trust for S.M.L. When they could not work out a visitation agreement, he revoked his offers and told Wendy that "he has a [trust] fund set up in his name. It doesn't have [S.M.L.'s] name on it because that would give me rights as her mother and he'll make sure I never see a penny of it."

At the hearing on temporary orders, Wendy was asked, "You generally think it's in the best interest of [S.M.L] that she develop à relationship with her grandfather?" She answered, "I would like—yes, I would like for her to develop a relationship with her grandfather." She did not believe overnight visits were in S.M.L.'s best interest because they might be traumatic to a child of S.M.L.'s young age; she also feared Ray might be violent toward S.M.L. if he had unsupervised access to her. However, she admitted that before she and Clay decided to divorce, they once left S.M.L. overnight with Ray. She was willing to allow Ray several hours of supervised visitation a week.

At the final hearing, Wendy said she had allowed Ray visitation in excess of that ordered by the associate judge because it was in S.M.L.'s best interest "[t]o establish a bond with her grandfather." Wendy testified that for a year preceding the final hearing, Ray had been picking up S.M.L. at 10:00 a.m. on Saturday and bringing her home at 6:00 p.m. on Sunday on the first and third weekends of each month. He also had S.M.L. for a week in the summer and a couple days after Christmas. They followed this schedule for almost a year and a half.

Before the hearing for permanent orders, Wendy and Ray attended mediation and agreed that Ray could have S.M.L. from 10:00 a.m. Saturday to 6:00 p.m. Sunday the first weekend of each month, from 6:00 p.m. Friday to 6:00 p.m. Sunday the third weekend of each month, every other Father's Day, a couple days between Christmas and New Year's Day, and two nonconsecutive weeks in the summer. However, when she received a draft of the mediated visitation schedule about five days before the final hearing, Wendy noted it allowed Ray to pick up S.M.L. on Friday evening both the first and third weekend of each month and named Ray's wife as a grandparent. Wendy objected to both of these changes. She objected to Ray's wife's being added to the visitation schedule because she was not S.M.L.'s natural grandparent. When questioned further, Wendy also stated she did not want Ray to have S.M.L. two weeks in the summer and did not "like him coming to get her every other weekend." She said she agreed to the mediated visitation schedule but felt she had no choice because she could not afford to fight it out with Ray in court.

Wendy said she did not think it was in S.M.L.'s best interest to have frequent and extended visits with Ray. She did not want Ray to pick up S.M.L. on Friday evenings twice a month because she had very limited time with S.M.L. due to her work and school schedules. Wendy asked the court to limit Ray to supervised daytime visits during the week so S.M.L. would not have to travel and could spend more time with Wendy on the weekends. She believed one supervised, weekday visit every two months would be reasonable. She testified that after spending a weekend with Ray, S.M.L. is "very whiny and fussy and off schedule," and it takes two or three days to get her back on schedule. She added,

[S.M.L. is] two, and we're working on words and manners and asking for things, and [after her visits with Ray] she just whines for everything and just points. And that's not generally how she is with me, she'll ask me for what she wants and tell me what she wants, just generally different.

Wendy said that if each of S.M.L.'s four natural grandparents sought the kind of access Ray sought, Wendy would not get to spend any weekends with S.M.L.

Carolyn Lilley, Ray's second wife and Clay's mother, was married to Ray for eighteen years until their divorce in 1991. When asked about Ray's parenting skills, she said,

He was always there ready to hand out the money. He was a very hard disciplinarian to the point of being abusive. He—his children were allowed to do no wrong. . . . He did not listen when they had something to say. It was either [Ray's] way or no way. He didn't—there was no mediation in between.

She said she would not describe him as a loving or caring father and said he was physically and mentally abusive toward her and the children. She did not recall whether she had seen Ray with S.M.L. since Clay's death. Carolyn worries about Ray being with S.M.L. because he is manipulative and mentally abusive. She testified that she and Wendy had arranged for her to see S.M.L. without resorting to legal action.

Shonda, Clay's sister and Ray's daughter, testified she did not think it was in S.M.L.'s best interest for Ray to have regular access to the child because he is mentally abusive. She said he was physically and mentally abusive when she lived with him; he last struck her in late 1996 or 1997. Asked whether her father could compromise, she said, "I don't know if he is incapable [of meeting in the middle] but

I don't think that I ever have seen him do it." She said that Ray had a better relationship with Clay than with her and that he was not as abusive toward Clay. When asked if Ray was a loving, caring father, Shonda answered, "I don't know that he knows really how to show love except for money, and I hate to say that but that is the truth." However, she said that since her brother died, Ray had changed the way he talked to her and they had a better relationship than they had ever had. Shonda said Ray is still mentally abusive at times, but they "get along for the most part now." She had never had any problems working things out with Wendy and

did not think Wendy was unreasonable, controlling, or manipulative. She said Ray had a good relationship with S.M.L. now and she did not think Ray would physically hurt S.M.L., but as S.M.L. grows up, Shonda fears there will be mental abuse "because he doesn't know when he does it, it is second nature."

While there is evidence to support Wendy's arguments against visitation, there is also evidence supporting Ray's continued access to S.M.L. Wendy has not shown that the district court abused its discretion in allowing Ray to have regular visitation with S.M.L.[1] Wendy cites to *Dolman v.*

1. Wendy cites the following opinions from other states, all of which are distinguishable: *Kennedy v. Kennedy*, 688 N.E.2d 1264 (Ind.Ct. App.1997), *trans. denied; Ward v. Dibble*, 683 So.2d 666 (Fla.Dist.Ct.App.1996); *Steward v. Steward*, 111 Nev. 295, 890 P.2d 777 (1995); *Weybright v. Puckett*, 262 Ill.App.3d 605, 200 Ill.Dec. 18, 635 N.E.2d 119 (1994); *Strouse v. Olson*, 397 N.W.2d 651 (S.D.1986); *Com. ex rel. Zaffarano v. Genaro*, 500 Pa. 256, 455 A.2d 1180 (1983); *Ross v. Powell*, 359 So.2d 803 (Ala.Civ.App.1978); and *Rodriguez v. Rodriguez*, 295 So.2d 328 (Fla.Dist.Ct.App. 1974).

The courts in *Ross, Weybright, Kennedy, Zaffarano,* and *Strouse* affirmed the trial courts' decisions and held the trial courts did not abuse their discretion in ruling against the grandparents. *Ross* involved a grandmother who had attempted suicide in the past and who "often act[ed] irrationally and suffer[ed] from an overactive imagination," and a grandfather with Parkinson's Disease who became disoriented, agitated, confused, delusional, and extremely angry. *Ross,* 359 So.2d at 807. In *Weybright,* the grandmother had not seen her five year old grandchild in four years. *Weybright,* 200 Ill.Dec. 18, 635 N.E.2d at 120. The court of appeals affirmed the trial court's refusal to order visitation because to do so would introduce a stranger into the child's life and because the grandmother did not show visitation was in the child's best interest. *Id.* at 120, 122. In *Kennedy,* the grandmother had a history of psychological problems, had attempted suicide once, and was caught stockpiling medications in apparent preparation for another attempt. *Kenne-*

*dy,* 688 N.E.2d at 1266. Evidence indicated she refused to use counseling to resolve her differences with her son, the child's father; refused to honor the father's wishes regarding the child's upbringing; criticized the father to the child; and blamed the family's problems on the father. *Id.* at 1266, 1269. In *Zaffarano,* evidence indicated the petitioning grandparents had said the father was at fault for the mother's death and was not a good father or husband; the grandparent's other daughters, the child's aunts, also spoke ill of the father; and the father demanded that all photographs of the deceased mother be removed when the child visited. *Zaffarano,* 455 A.2d at 1181. The trial court found visitation was not in the child's best interest because of the ill will between the parties, but the court of appeals reversed, holding there was no irreconcilable ill will and the grandparents had shown visitation was in the child's best interest; the Pennsylvania Supreme Court reversed the court of appeals, noting the trial court could better judge the demeanor and sincerity of the parties. *Id.* at 1181–84. Finally, in *Strouse,* the father sought to bar his mother from visiting his children. *Strouse,* 397 N.W.2d at 653. The trial court found visitation was not in the best interest of the children and the court of appeals affirmed because of the "severe ill feelings, bitterness, and animosity" between the parties, noting the grandmother had "threaten[ed] civil suits over personal property matters, threaten[ed] [the father's] life," and the children did not wish to visit. *Id.* at 655.

*Ward* reversed a trial court's judgment ordering the grandchildren, who lived in Flori-

*Dolman,* 586 S.W.2d 606 (Tex.Civ.App.—Austin 1979, writ dism'd w.o.j.),[2] and argues that Ray did not prove access was in S.M.L.'s best interest. However, Wendy admitted it was in S.M.L.'s best interest to build a relationship with her grandfather. There was no testimony that Ray had in any way mistreated S.M.L. during the eighteen months of visitation before the final hearing. That a two-and-a-half year old child was fussy after visiting Ray does not indicate that such visits are not in her best interest. The bad acts testified to by Ray's ex-wife and daughter were years in the past and he has received counseling since then. Ray's daughter testified that Ray had changed since Clay's suicide and that she and he had a better relationship than they had ever had. It is up to the fact-finder to resolve conflicts in the evidence. *Schneider,* 5 S.W.3d at 931. Wendy has not shown the district court abused its discretion in ordering that Ray should have scheduled visitation with S.M.L. *G.K.,* 936 S.W.2d at 72. We overrule Wendy's first issue on appeal.

In her second issue on appeal, Wendy contends the district court's order granting Ray grandparent access infringes on her fundamental right to make child-rearing decisions, violating her due process rights under the United States Constitution. *See* U.S. Const. amend. XIV, § 1. She cites *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), in support of her constitutional argument.

da, to visit their grandmother in New York because the trial court had improperly shifted the burden to the father to justify his denial of visitation, rather than requiring the grandmother to present competent evidence that visitation was in the children's best interest. *Ward,* 683 So.2d at 668–69. *Rodriguez,* decided more than twenty years ago and holding "an order granting visitation rights to a nonparent of a child whose custody has been awarded to a fit parent ... [was] unjustified and unenforceable," *Rodriguez,* 295 So.2d at 329, has apparently been replaced by statute. *See Ward,* 683 So.2d at 668 ("For several years, by statute, Florida law has authorized grandparents, under certain circumstances, to commence an action in the circuit courts for visitation with their grandchildren."); *see also Wishart v. Bates,* 531 So.2d 955, 956 (Fla.1988).

In *Steward,* the Nevada Supreme Court reversed the trial court's visitation order, holding the trial court inadequately reviewed the record and the grandparents had not presented any evidence that visitation would be in the child's best interest. *Steward,* 890 P.2d at 783. However, the facts in *Steward* are very different from this cause. The paternal grandparents sought visitation and both parents, who were divorced, objected. *Id.* at 778. The grandmother threatened to kill herself if denied visitation; was a heavy gambler who stayed out two to three days at a time; called the mother a whore and hoped she would miscarry; was "insane, dangerous, and conniving"; and had "unpredictable outbursts of anger." *Id.* at 778–79. After one visit the baby was returned home with a dirty diaper that had not been changed all night, resulting in a terrible rash. *Id.* at 778. The father had moved to another state and did not want his mother to learn his new address. *Id.* There is no evidence in the record before us of any such extreme or dangerous behavior.

2. In *Dolman v. Dolman,* 586 S.W.2d 606 (Tex. Civ.App.—Austin 1979, writ dism'd w.o.j.), a paternal grandmother petitioned for access to her nearly twelve year old granddaughter, who she had not seen in more than ten years. 586 S.W.2d at 609. The grandmother had never learned to pronounce the child's name and had not written the child since the child learned to read. When prevented from seeing the child, the grandmother went to the child's school and took photographs with a child who was not her grandchild. Even after testimony established that the child in the pictures was not her grandchild, the grandmother "did not appear entirely persuaded of her mistake." *Id.* The child's father testified he would not consent to allowing his mother to see his daughter. He said life with his mother was "intolerable" and "miserable," and while he was growing up she seemed to love him one moment and despise him the next. *Id.*

On the surface, the facts in *Troxel* are similar to the facts in the cause at hand. Both involve grandparents petitioning for visitation of their grandchildren after the fathers of the grandchildren committed suicide. However, the differences between the two cases bear discussion. Granville, the mother, was never married to Brad, the Troxels' son and the father of Granville's two daughters. *Troxel*, 120 S.Ct. at 2057. Granville and Brad separated, and Brad lived with the Troxels and brought his daughters there for regular weekend visits. Brad committed suicide two years later, and the Troxels continued to see the grandchildren on a regular basis for another five months after Brad's suicide. At that point, Granville told the Troxels she wished to limit their visitation to one short visit each month. Two months later, the Troxels petitioned for visitation.[3] *Id.* at 2057–58. Granville did not oppose visits with the Troxels altogether; she asked the trial court to limit such visitation to one day a month with no overnight visits. *Id.* at 2058. The trial court granted the Troxels visitation one weekend each month, a week each summer, and four hours on each grandparent's birthday. Granville appealed, and the Washington Supreme Court held the statutes were facially unconstitutional because they interfered with a parent's decision-making without requiring a showing that the child might be harmed by the decision and because they were too broad in allowing "any person" to petition for visitation at "any time." *Id.* at 2058–59; *see In re Custody of Smith*, 137 Wash.2d 1, 969 P.2d 21, 30 (1998).

The United States Supreme Court granted certiorari and affirmed the Washington Supreme Court's judgment. *Troxel*, 120 S.Ct. at 2059. A plurality of the Court held that, as applied to the particular facts, the Washington statute unconstitutionally infringed on a parent's right to make decisions concerning the care, custody, and control of her children. *Id.* at 2060–61 (plurality opinion by O'Connor, joined by Rehnquist, Ginsburg, and Breyer; two concurring opinions by Souter and Thomas; three dissenting opinions by Stevens, Scalia, and Kennedy).

The Court did not address whether a nonparental visitation statute must require a showing of harm or potential harm to the child before granting visitation. *Id.* at 2064. Instead, noting that "much state court adjudication in this context occurs on a case-by-case basis," the Court emphasized that it was ruling on "the sweeping breadth" of the Washington statute and its application to the specific facts at hand:

> ... [T]he visitation order in this case was an unconstitutional infringement on Granville's fundamental right to make decisions concerning the care, custody, and control of her two daughters. The Washington Superior Court failed to accord the determination of Granville, a fit custodial parent, any material weight. In fact, the Superior Court made only two formal findings in support of its visitation order [that grandparents were part of large, loving family that would give children opportunities and that chil-

---

**3.** The Troxels petitioned for visitation under two Washington statutes, section 26.09.240 and section 26.10.106(3). Section 26.09.240 was not addressed in *Troxel*. *Troxel*, 120 S.Ct. at 2057. The Supreme Court only addressed the constitutionality of section 26.10.160(3), which provided that:

Any person may petition the court for visitation rights at any time including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances.

Wash.Rev.Code Ann. § 26.10.160(3) (West 1995, since significantly amended).

dren would benefit from time with grandparents].... These slender findings, in combination with the court's announced presumption in favor of grandparent visitation and its failure to accord significant weight to Granville's already having offered meaningful visitation to the Troxels, show that this case involves nothing more than a simple disagreement between the Washington Superior Court and Granville concerning her children's best interests.... Neither the Washington nonparental visitation statute generally—which places no limits on either the persons who may petition for visitation or the circumstances in which such a petition may be granted—nor the Superior Court in this specific case required anything more. Accordingly, we hold that § 26.10.160(3), as applied in this case, is unconstitutional.

*Id.* at 2063–64.

The *Troxel* Court noted that the Washington statute did not require a trial court to give any validity to the parent's decision, placing the best-interest determination solely in the hands of the trial judge, who "gave no special weight at all to Granville's determination of her daughters' best interests" and "placed on Granville, the fit custodial parent, the burden of *disproving* that visitation would be in the best interest of her daughters." *Id.* at 2061–62. There is no indication that the district court here made any such presumptions or required Wendy to show S.M.L. would be harmed by visitation with Ray. Indeed, Wendy and Ray arranged eighteen months of substantial visitation, and Wendy repeatedly testified before the district court and associate judge that she believed it was in S.M.L.'s best interest to have a relationship with Ray.

Section 153.433 of the Texas Family Code is not "breathtakingly broad," as was the Washington statute in *Troxel.* *Id.* at 2061. Section 153.433 allows only grandparents, under particular circumstances, to petition for access to a child, provided it is in the child's best interest. Tex.Fam.Code § 153.433. The Texas grandparent access statute has already been examined and held to be constitutional. *Deweese v. Crawford,* 520 S.W.2d 522, 526 (Tex.Civ. App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.), *overruled on other grounds by Cherne Indus., Inc. v. Magallanes,* 763 S.W.2d 768, 772 (Tex.1989) ("The state has sufficient interest in the family relationship to permit legislation in this area."); *see Dolman,* 586 S.W.2d at 608.

Further, in *Troxel* the parents were never married and the State had not been invited to intervene in the family relationship; the Troxels had enjoyed regular visitation with their grandchildren for two and a half years before their son's suicide and petitioned for access about seven months later. *Troxel,* 120 S.Ct. at 2057. In our cause, Wendy and Clay sought the State's intervention into their family's relationships when they filed to dissolve their marriage. When Clay committed suicide in the midst of an unpleasant divorce with parental access issues, the State was already involved in making visitation arrangements for S.M.L. Ray filed his petition during an emotionally-charged situation with the daughter-in-law he partially blamed for his son's recent suicide. There is evidence in the record that Wendy had denied Clay access to S.M.L. while the divorce was pending, and at the pretrial hearing Ray indicated that he believed Clay's suicide was partially related to that denial. Ray testified he had received counseling to work through his feelings of blame and anger toward Wendy.

Perhaps the most important distinction between *Troxel* and this cause is that Granville never sought to deny visitation to the grandparents as Wendy does on this

appeal; Granville's consistent position was that she wanted shorter and fewer visits than those requested by the Troxels. *Id.* at 2062–63. Wendy, on the other hand, has taken inconsistent positions about Ray's access to S.M.L. She stated multiple times that she believed it would be in S.M.L.'s best interest to have a relationship with her grandfather. At the temporary hearing her position was that Ray should not have S.M.L. for overnight visits, but after the associate judge entered temporary orders, she agreed to overnight visitation. Wendy and Ray worked out a voluntary visitation schedule that gave Ray more time with S.M.L. than does the final order from which she appeals. Ray exercised the agreed-upon visitation for almost eighteen months without incident. At mediation, Wendy agreed to a schedule very similar to the one imposed by the court. On appeal, she now takes the position that Ray should be allowed no visitation because he poses "a serious threat to [S.M.L.'s] safety and well being," and is not fit to have authority over her. Given her earlier agreements and the eighteen months of successful visitation, Wendy's argument on appeal that visitation with Ray is suddenly not in S.M.L.'s best interest appears disingenuous. The district court was entitled to consider all of her positions, weigh the conflicting testimony and the visitation schedule that had been in place, and finally determine whether visitation with Ray would be in S.M.L.'s best interest. *Schneider,* 5 S.W.3d at 931.

The Texas statute is not unconstitutional on its face or in the district court's application to the facts at hand. Given Wendy's inconsistent positions with regard to visitation, we cannot say that the district court abused its discretion in allowing Ray less time with his granddaughter than the interim schedule to which Wendy initially agreed. The district court balanced Wendy's varying positions and rights as

S.M.L.'s mother with Ray's request for visitation and the child's interest in having a continuing relationship with her deceased father's family. We overrule Wendy's second issue on appeal and affirm the district court's order.