Stephen Hugh ROBY, Appellant,

v.

Ronald ADAMS and Jennie Adams, Appellees.

No. 08–00–00080–CV.

Court of Appeals of Texas, El Paso.

Jan. 3, 2002.

Barrett Keith Brown, Law Offices of Barrett Keith Brown, Sherman, for Appellant.

John Kermit Hill, Hill, Ellis, Hill & Shea, Sherman, for Appellees.

Before Panel No. 2: BARAJAS, C.J., McCLURE, and CHEW, JJ.

### OPINION

DAVID WELLINGTON CHEW, Justice.

Appellant Stephen Hugh Roby appeals from the trial court's granting of grandparent access to Appellees Ronald and Jennie Adams. On appeal, Roby brings a single issue: (1) the trial court erred in granting grandparent access to the Adams. We reverse and remand.

Roby and Salena Adams were married on September 26, 1986, and the couple had two children, Jared and Jordan, born June 6, 1994 and August 2, 1995, respectively. In September 1998, Salena died from breast cancer.

The Adams testified that they were very close to their daughter, Salena, and the two grandchildren and saw them weekly. After Salena became ill, the Adams saw the grandchildren three to four times per week and made telephone calls to the grandchildren every day. However, after Salena's death, Roby reduced the contact between the Adams and his children to about twice a week then refused the Adams any contact with the children, beginning in late December 1998 or January 1999.

When Roby refused to return the phone calls and terminated any communications with the Adams, the Adams filed for grandparent access on February 4, 1999. After a hearing and consideration of two social study reports, the trial court granted grandparent access to the Adams on December 1, 1999. The visits were to be on the first weekend of each month, December 26 through December 29 of each year, and for any two weeks period during the summer months.

Roby has asked this Court to determine the difficult question of the factual sufficiency of the trial court's judgment that granting grandparent access to the Adams would be in the best interest of Roby's children. When addressing a challenge to the factual sufficiency of the evidence, the reviewing court looks at all the evidence to determine whether the finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). We do not substitute our judgment for that of the fact finder's and will sustain the fact finder's conclusions if any probative evidence supports the finding. *See Galveston Co. Fair & Rodeo, Inc. v. Kauffman,* 910 S.W.2d 129, 135 (Tex.App.-El Paso 1995,

writ denied). We may not interfere with the fact finder's resolution of the conflicts in the evidence or weigh the credibility of the witnesses and their testimony. *See Reynolds v. Kessler,* 669 S.W.2d 801, 807 (Tex.App.-El Paso 1984, no writ).

TEX.FAM.CODE ANN. § 153.433 (Vernon Supp.2002) governs the granting of grandparent access to a child in this case:

The court shall order reasonable access to a grandchild by a grandparent if:

(1) at the time the relief is requested, at least one biological or adoptive parent of the child has not had that parent's parental rights terminated; and

(2) access is in the best interest of the child, and at least one of the following facts is present:

(A) the grandparent requesting access to the child is a parent of a parent of the child and that parent of the child ... has been found by a court to be incompetent or is dead....

TEX.FAM.CODE ANN. § 153.002 (Vernon 1996) states that the best interest of a child should "always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." A trial court has wide discretion in determining the best interest of a child. *See Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex. 1982). The decision of a trial court will be reversed only if, after considering the record as a whole, it is clear that the trial court abused its discretion. *See id.*

The U.S. Supreme Court stated in *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), the presumption that a fit parent acts in the best interest of his or her child. *See id.* at 69–72, 120 S.Ct. at 2062–63 (holding the trial court's order granting visitation to grandparents against the parent's decision was unconstitutional).

Heeding the holding in *Troxel,* we will consider the evidence in its entirety in determining whether the trial court abused its discretion in holding that grandparent access was in the best interest of the Roby children, against the presumption that Roby acted in the best interest of his children. During trial, the testimony and evidence directly conflicted.

### Roby's Evidence

The social study investigator, Sheri Fallon, testified that Roby was concerned about any contact between his children and the Adams because he thought the Adams' home was not sufficiently clean, the Adams did not believe in medicating for illness, and as his largest concern, the discipline applied to the children by Mrs. Adams. Roby described to her how Mrs. Adams would tell Jared that the devil made him do bad things; grab Jared and not let go of him until he told the "devil to be gone;" and was "overboard with the church thing."

At the hearing, Roby testified that he would not permit his children to be with the grandparents, unless he was in supervision, because he thought the children would be in danger:

Q: Do you think they [children] are in danger when they are with their grandparents? Is that what it is?

A: [by Roby] Yes.

Q: Is it because of this medicine deal or lack of medical treatment? Is that the issue that you have?

A: Part of it.

. . .

Q: Mr. Roby, if you were going to list in order of importance, what is the main reason that you want this

Court to deny Mr. and Mrs. Adams access to these children? What are you fearful of?

A: Just that the kids are . . . Just danger of emotional abuse.

Q: By whom?

A: The Adamses [sic].

. . .

Q: In the alternative, Mr. Roby, are you asking that any access that Mr. and Mrs. Adams have be in your presence, Mr. Roby?

A: Yes.

Roby specified that his concerns about the Adams' attitude toward medication originated from the fact that his wife Salena had died from cancer two years after its diagnosis and in that time, she had refused any medical treatment for the cancer. She had instead chosen to look to God and pray, and Roby felt that Salena's decision resulted from Mrs. Adams' encouragement, leading to Salena's death.

The repugnance that Roby feels for the Adams also originated from his witnessing Mrs. Adams' method of disciplining his children. Roby said that the Adams told the children crickets were demons and when they saw a cricket, the children would scream, "Daddy, there is a devil in my room." The children were also unable to sleep for fear. Mrs. Adams also disallowed stuffed toys or pinatas because they were "bad." In particular, when the older child, Jared, misbehaved, Mrs. Adams would grab him then ask why he had done that. Jared would respond, "The devil made me do it," and Mrs. Adams would ask, "Is that the right thing to do?" and in reply he said, "No." Roby's mother, Ruby Roby, also witnessed Mrs. Adams grab Jared and tell him "Demon be gone" when he had misbehaved. When he returned from work unexpectedly one day, Roby said that he surprised Mrs. Adams pinning Jared down in a rite of exorcism while Salena was present. The events happened repeatedly in front of Roby and Salena, but Roby was told each time by Mrs. Adams that she knew best. Salena supported her mother, and Roby felt that he could do nothing at the time to stop Mrs. Adams.

## The Adams' Evidence

The Adams denied each and every reason given by Roby for barring any visits between the Adams and Roby's children. Mr. Adams testified that his daughter Salena had made the decision to not seek medical treatment on her own. Mrs. Adams said that she was a trained registered nurse and had encouraged Salena to seek a second medical opinion when the cancer was diagnosed. It was also her understanding that Salena had made the decision to not seek medical treatment. She had also never held down the children and tried to exorcise demons from them.

In support of their petition for grandparent access, the Adams testified that they have had a loving relationship with their daughter Salena and the grandchildren and they saw each other nearly every day. The Adams said that they believed having visiting rights to the children would be in their best interest.

## The Social Study Report

Fallon recommended in her report for the children to have regular visits with the Adams. Fallon reported that "[i]t is very apparent that Mr. and Mrs. Ronald Adams love their grandchildren, Jared and Jordan Roby, very much." She also expressed her concern over Roby's anger management.

## The Marriage Between Roby and Salena

Salena had left Roby in 1995 and filed for a protective order in Collin County, allegedly due to abuse. Although Salena filed for divorce, Roby and Salena attended counseling, and the marriage continued. Roby said that when Salena got upset, she would yell, and he would ask her to calm down and talk. However, the Adams expressed concern over Roby's temper and produced a tape that Salena had made of conversations between Roby and herself. Fallon stated that in the tape, a woman named "Salena," a second woman (unidentified), and a man named "Steve" were conversing, and "Steve" denied abusing the children, although he later said on the tape that he had lost his temper with the children and had shaken them when they were one week old. Roby said that his anger was due to his frustration with his in-laws and that he had learned much from a men's group for anger-control to which the marriage counselor had referred him.

## The Roby Children

Roby said that Jared was very intelligent, outgoing, and sensitive. He was aware that Jared missed his mother but that Jared kept quiet about it. Roby differentiates Jordan as being a "little clown" who likes getting attention. He was nervous that Jordan would miss Jared, who had started elementary school, and he was looking for a pre-school program for him, although Jordan was doing great even with Jared at school. Both children were in good health, Roby makes adequate income, and the rented house they live in had no health hazards.

Mrs. Adams told Fallon that once when the children had been at her home, she had noticed Jordan had "petiki" and his anal area was very red, and Jared told her that his father had hit Jordan with a wooden spoon on the bottom when Jordan would not go to sleep. Before Roby cut off communications between the Adams and the children, the Adams also noticed that Jared had outbursts of temper and would get upset at Jordan for little things such as knocking blocks over. The Adams also said that Jordan had told them that "he was a really bad boy and that his daddy would not hurt him if he would just do things right."

Jared told Fallon that he only had one grandmother (referring to Ruby Roby), but when asked if he had a Grandma and Grandpa "4 Wheeler" then he said "no" at first then "yes" very quietly. He said that he had fun riding horses and four-wheelers at the farm and that he had never been hurt there. There was nothing there that he did not like.

Jordan said he visited with Ruby Roby and that his dad had told him he would not see Grandma and Grandpa 4–Wheeler's house anymore. He responded "interesting" when first asked about how he felt about that then he said he felt sad because he liked going to see his grandparents. Jordan also said that the Adams were nice to him and never mean.

## The Character Witnesses for Roby and the Adams

The Adams' character witnesses all testified that the Adams and Salena had a very close relationship but that Salena and Roby had marital problems. Pat Elliot, a family friend, said that Salena had told Elliot's daughter and Elliot that Roby was abusive to Salena and the children. Beverly Hardy told Fallon that Salena had said that Roby was " 'overly disciplinarian in an extreme manner.' " Dale Lafoy, who attended church with the Adams, also described Roby as "strange" and "too quiet and stand-offish."

All of Roby's character witnesses described Roby as a caring father. Ann Zenkner and Betty Holman, Roby's aunts, described Roby as a good father who is fond of the children but nevertheless disciplines them firmly by time-outs, explanations, and rewards for good behavior. Although Zenkner did not know the Adams personally, Holman said that she had seen the Adams at special events and would not leave a child alone with them. Holman had witnessed Mrs. Adams calling Jordan to her and holding him close until he said "demon be gone." Patsy Burrows said Roby and the children were constantly together and doing activities. Mary Ward said that Roby seemed to be a good father, and that she had known the Adams at her Baptist church, before they left for another church, which she described as " 'a cult or something.' " Mary Ann Haigis, who had lived next to Roby's parents since 1992, said Roby was a loving and kind father and that she never saw him lose his temper. Ruth Bearden also knew Roby for about twenty years, and her children and Roby went to the same school. She had worked with Mr. and Mrs. Adams, and she said that the couple were "different." For instance, Mrs. Adams never talked about her grandchildren but only about her daughter's sickness.

Fallon concluded her report by pointing out that Roby had an anger-control problem. She then stated, "[n]ot only have Jared and Jordan Roby suffered from the loss of their mother, but also the loss of their maternal side of the family which could be emotionally traumatic to the children."

■ In *Troxel*, Justice O'Connor wrote that a special weight must be given to a fit parent's decisions regarding the denial of visitation rights to the grandparents, because the fundamental constitutional right of a parent to determine the rearing of the parent's children must be protected. *See id.* at 70, 120 S.Ct. at 2062. The Court stated, "the decision whether such an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance. And, if a fit parent's decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination." *Id.* Pointing out that the dispute in the case was over a simple disagreement as to the length of the visit allowable to the grandparents, the Court censured the imposition of a state judge's judgment over a parent's because the state judge believed it to be "better." *See id.* at 72–3, 120 S.Ct. at 2063–64.

There is no evidence that Roby is an unfit parent. While the Adams question his character, in particular his temper, they do not allege that he is an unfit parent. As a fit parent, Roby had the fundamental constitutional right to make decisions regarding the rearing of his children. Furthermore, Roby had indicated that he would be willing to consent to a supervised visit, as opposed to the monthly unsupervised visits that the trial court had granted to the Adams. This is much like the facts in *Troxel*, where the state judge disagreed with the parent's decision of what kind of visit was proper and imposed the judge's decision over the parent's. We do not believe the evidence warrants a finding that granting grandparent access would be in the best interest of the Roby children, against Roby's decision as a parent.

■ This Court is aware of the recent decision handed down by the Austin Court of Appeals in *Lilley v. Lilley*, 43 S.W.3d 703 (Tex.App.-Austin 2001, no pet.). In *Lilley*, the Court found it dispositive that the parent had testified that it was in the best interest of her child to have visitation with the grandparent and that the parent

828

had taken inconsistent positions on the grandparent's access to the child. The facts of our case are distinguishable in that Roby never declared it would be in the best interest of his children to allow the Adams access to the children and Roby was consistent in his position on the Adams' access to them. Furthermore, the holding in *Lilley* appears to place the burden of persuasion upon the parent to prove the best interest of the child. This goes against the presumption so strongly enunciated in *Troxel,* that a fit parent acts in the best interest of his or her child. A grandparent seeking access under TEX. FAM.CODE ANN. § 153.433 has the burden to overcome the presumption that a fit parent acts in the best interest of the parent's child in order to establish the "best interest of the child" prong of the statute.

We hold that the trial court abused its discretion in deciding that it was in the best interest of the Roby children to grant grandparent access to the Adams, over Roby's decision to limit the Adams' access to the Roby children. We sustain Roby's sole point of error. The judgment of the trial court is reversed and remanded for further proceedings consistent with this opinion.