# NO. 12-20-00143-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE 321ST* |
| *C.R.D. AND B.R.D.,* | § | *JUDICIAL DISTRICT COURT* |
| *CHILDREN* | § | *SMITH COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

J.L.D. appeals the trial court's order in a suit to modify the parent-child relationship. On appeal, he challenges the trial court's refusal to interview one of the children in chambers, failure to file findings of fact and conclusions of law, injunction of the parties' protected speech, predetermination of the penalty for injunction violation, and conditional grant of the expanded possession order. We affirm.

## BACKGROUND

J.L.D. is the father of C.R.D. and B.R.D., and S.E.J.M. is their mother. On March 6, 2019, the trial court signed an agreed order in a suit to modify the parent-child relationship, appointing J.L.D. and S.E.J.M. joint managing conservators of the children, and naming S.E.J.M. as the parent with the exclusive right to designate the primary residence of the children. J.L.D.'s possession periods generally followed an alternating weekend pattern during the school year with alternating weeks during the summer months. On August 30, S.E.J.M. filed a petition to modify the parent-child relationship, alleging that J.L.D. was harassing her and making harmful statements to the children about her. She requested to be named sole managing conservator of the children and that J.L.D. be prohibited from having access to the children until he submitted to a psychological evaluation, or, alternatively, that his possession and access be supervised. On September 3, J.L.D. filed a counterpetition alleging that S.E.J.M. abused and neglected the

children, and requesting that the trial court modify the designation of the parent having the exclusive right to designate the primary residence of the children.

After a bench trial, the trial court found that modification of the previous order was in the best interest of the children. The court made no changes to conservatorship or S.E.J.M.'s exclusive right to designate the primary residence of the children but ordered that J.L.D. participate in counseling regarding appropriate conversation boundaries with the children and appointed a coparenting consultant to assist the parents in formulating a coparenting plan. The court reduced the amount of J.L.D.'s possession periods to a standard possession order. However, upon J.L.D.'s completion of six sessions with the coparenting consultant and four sessions with the counselor, his possession time would increase to the expanded standard possession order. Finally, the court ordered that if either party violated the injunction against discussing the case, conservatorship, possession, or support with the children, a $5,000.00 sanction would be levied against the party. This appeal followed.

## FAILURE TO INTERVIEW CHILD IN CHAMBERS

In Appellant's first issue, he argues that the trial court reversibly erred by refusing to interview twelve-year-old C.R.D. in chambers.

### Standard of Review and Applicable Law

Chapter 153 of the family code sets out the overarching policy of the State of Texas regarding child custody issues. In suits affecting the parent-child relationship,

> (a) [t]he public policy of this state is to:
>
> (1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child;
>
> (2) provide a safe, stable, and nonviolent environment for the child; and
>
> (3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage.

TEX. FAM. CODE ANN. § 153.001(a) (West 2014). Furthermore, "[t]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." *Id.* § 153.002 (West 2014).

Chapter 153 also provides the following:

(a) In a nonjury trial or at a hearing, on the application of a party, the amicus attorney, or the attorney ad litem for the child, the court shall interview in chambers a child 12 years of age or older and may interview in chambers a child under 12 years of age to determine the child's wishes as to conservatorship or as to the person who shall have the exclusive right to determine the child's primary residence.

*Id.* § 153.009(a) (West 2014). The word "shall" imposes a duty unless the context in which it appears necessarily requires a different construction or a different construction is expressly provided by statute. TEX. GOV'T CODE ANN. § 311.016(2) (West 2013).

We review issues of statutory construction de novo. ***Molinet v. Kimbrell***, 356 S.W.3d 407, 411 (Tex. 2011). Our primary objective in construing statutes is to give effect to the legislature's intent. *Id.* The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results. *Id.*

**Analysis**

In J.L.D.'s counterpetition, he stated the following:

> [C.R.D.], the child the subject of this suit, will be twelve years of age or older on October 22, 2019 and will express to the Court in chambers, as provided in section 153.009 of the Texas Family Code, the name of the person who is the child's preference to have the exclusive right to designate the primary residence of the child. [B.R.D.], while, only eight years of age, if given the opportunity, will express to the Court in chambers, the name of the person who is the child's preference to have the exclusive right to designate the primary residence of the child.

Additionally, he filed a "Motion for Judge to Confer with Children," in which he made the following request:

> For the purpose of determining the best interest of the children, [J.L.D.] requests the Court to confer with the children, in chambers, to determine each child's wishes as to who shall have the exclusive right to determine the child's primary residence.

The three day bench trial in this case took place over the course of several weeks. On the second day of trial, Matthew Thigpen, the court-appointed amicus attorney, told the court he was aware that a motion to confer was before the court and C.R.D. was scheduled to be interviewed that day. However, Thigpen received information that morning that C.R.D. had a "rough night," and he was concerned that C.R.D. might not be mentally prepared for the interview.

3

Consequently, he asked a school counselor, Julie Surratt, with whom C.R.D. had a good rapport, to speak with C.R.D. at lunchtime. If, after that meeting, Surratt believed C.R.D. was not mentally prepared for the interview and would be harmed by it, Thigpen would contest the motion to confer.

After the lunch recess, Thigpen reported to the court that Surratt spoke with C.R.D. and believed the interview would not be traumatic to C.R.D. Later that day, during Thigpen's cross-examination of S.E.J.M., he was alerted that the children had arrived at the courthouse, their maternal grandmother had left the courtroom to speak with them, and "something was going on." During a recess, Thigpen spoke with C.R.D., who said that he was feeling sick, his stomach hurt, he was very concerned, and he did not want to be "stuck in the middle of all of this." Thigpen told the court that previously in his office, he observed C.R.D. develop physical manifestations of stress including stomachache and vomiting. Consequently, Thigpen concluded that the interview would harm C.R.D. and requested that the trial court suspend the motion to confer until the case was resolved. The trial court concurred and did not interview C.R.D. that day, agreeing that when a child exhibits physical manifestations of stress related to coming to the courthouse to talk to the judge, he is being traumatized. The case was then recessed for just under a month.

On the next day of trial, during closing arguments, Thigpen reported to the court that he interviewed the children in his office the previous day. He said that C.R.D. exhibited every physical symptom of significant acute anxiety and long term depression. He reported that C.R.D. could not verbalize any statement but sat with a skull mask over his face, a hoodie on, and his head down. When Thigpen asked him about his parents' houses, he appeared to fall asleep. Thigpen then told him to give him a thumbs up or thumbs down so he would not have to speak and be further traumatized. When asked whether he felt safe at each parent's house, C.R.D. gave a thumbs up. When asked whether he loved each of his parents, he gave a thumbs up. When asked what he would change about the possession schedule if he could, C.R.D. shrugged.

After the parties presented their closing arguments, the trial court asked J.L.D.'s counsel whether he was still urging his motion to confer with the child. J.L.D.'s counsel responded in pertinent part as follows:

> If you're thinking of changing the conservatorship schedule, to harm my client with it, yes, I want you to talk to the child first.

If you're not, then, there's no reason. I know, no matter what the child says, you're not going to change the primary. Okay. I'm not concerned about that.

My suggested relief is to leave the conservatorship, support, and visitation just like it was[.]

And if you're going to do supervised, or any of that kind of thing, before you do that, I want you to talk to the child[.]

The trial court then recessed the case to consider its ruling.

The next day, after the trial court ruled that J.L.D.'s possession be reduced to a standard possession order until he fulfilled the counseling requirements, J.L.D.'s counsel stated that he was puzzled by the ruling because Thigpen recommended a seven-days-on/seven-days-off schedule.[1]  Subsequently, the following exchange occurred:

TRIAL COURT: [A]t this point, whether Mr. Thigpen recommended it or not, I am not going to grant a seven-on/seven-off visitation schedule. I don't think that's appropriate in this case.

J.L.D.'S COUNSEL: But you didn't talk to the child.

TRIAL COURT: I didn't supervise your client's visitation either, Mr. Rosenstein.

If you feel that that's fodder for appeal, then so be it.

But there is ample evidence that this child was traumatized by the thought of coming to talk to me, and I'm not going to put that child in that position. Just not going to do it.

Nothing more was said regarding the motion to confer.

On appeal, J.L.D. argues that the trial court abused its discretion by refusing to interview C.R.D. in chambers to determine his wishes regarding conservatorship or the person who shall have the exclusive right to determine the child's primary residence.  S.E.J.M. argues that the trial court did not err by refusing to interview C.R.D. because it heard evidence of C.R.D.'s desires, found that the interview would harm C.R.D., and found that the interview would not provide necessary evidence.  Alternatively, S.E.J.M. argues that the error was harmless.  We agree with S.E.J.M. that the trial court did not err, and further observe that the issue was not preserved for our review.

Before a complaint may be presented for appellate review, the record must show that it was made to the trial court by a timely request, objection, or motion.  TEX. R. APP. P. 33.1(a)(1).

---

[1] The record shows that Thigpen recommended the expanded standard possession order.

However, a complaint that is subsequently withdrawn is waived. *See Lemos v. State*, 27 S.W.3d 42, 47 (Tex. App.—San Antonio 2000 pet. ref'd) (counsel's comment "I withdraw my objection to that" waived complaint on appeal). In J.L.D.'s motion to confer, he properly invoked Section 153.009(a), but he later withdrew that request. Although change in conservatorship was originally requested by both parties, by the end of the evidence and closing arguments, neither party was contesting conservatorship or who would have the exclusive right to designate the primary residence of the children. The parties agreed that they did not get along and the children were caught in the middle. The dispute centered on which party was putting the children in the middle of the ongoing conflict. S.E.J.M. argued that J.L.D. was the one at fault and his access and possession should be reduced or supervised. J.L.D. argued that S.E.J.M. was the one at fault, her attempted modification was frivolous, and nothing should be changed. Thigpen concurred that both parties' coparenting abilities and communication were poor and the children were stuck in the middle. He recommended that they remain joint managing conservators with strict injunctions and counseling orders.

After closing arguments, when the trial court asked whether J.L.D. was "still urging the motion that I visit with [C.R.D.]," J.L.D. responded that he was "not concerned" about whether the court was going to "change the primary," but wanted the court to visit with C.R.D. only if it was considering changing the visitation schedule or ordering supervised visitation. We construe this statement as a withdrawal of J.L.D.'s request that the court interview C.R.D. regarding his wishes as to conservatorship and the person who would have the exclusive right to determine his primary residence, and a request that the court interview C.R.D. regarding his wishes as to possession and access. Section 153.009(b) provides that a trial court may interview a child in chambers to determine his wishes as to possession, access, or any other issue in the suit affecting the parent-child relationship. TEX. FAM. CODE ANN. § 153.009 (b) (West 2014). Whether to conduct such an interview is discretionary with the court. *See* TEX. GOV'T CODE ANN. § 311.016(1) (West 2013) ("may" creates discretionary authority or grants permission or a power). J.L.D. does not argue on appeal that the trial court erred by failing to grant a discretionary interview of C.R.D. under Section 153.009(b) regarding his wishes as to possession and access. Because J.L.D. withdrew his request that the court interview C.R.D. under Section 153.009(a), we conclude that he waived this complaint on appeal. *See Lemos*, 27 S.W.3d at 47.

Furthermore, even if J.L.D. did not waive his complaint, we cannot conclude the court erred in this case because the evidence shows that an interview would endanger C.R.D.'s safety and welfare so that it could not be in his best interest. *See* TEX. FAM. CODE ANN. § 153.002 (best interest of child is primary consideration in determining conservatorship, possession, and access issues). The plain meaning of Section 153.009(a) is that an interview with a child who is at least twelve years old regarding the person who shall have the exclusive right to determine the child's primary residence is mandatory upon the application of a party. However, when the court finds that conducting an interview would endanger the child's safety and welfare so that it could not be in his best interest, a mandatory interview would undermine the primary consideration the court is to follow under Section 153.002 and lead to an absurd result. *See id.*; *Molinet*, 356 S.W.3d at 411.

The Texas Supreme Court provided guidance on the interplay between Section 153.002 and other mandatory provisions in the Texas Family Code in *In re Lee*, 411 S.W.3d 445 (Tex. 2013). In that case, the parties executed a mediated settlement agreement (MSA) giving the mother periodic access to and possession of the child and enjoining her registered sex offender husband from being within five miles of the child at any time. *Id.* at 447. After hearing the evidence—which included evidence that the mother previously allowed her husband to have contact and reside in the house with the child in violation of his community supervision conditions—the district court concluded that entry of judgment on the MSA was not in the best interest of the child and consequently refused to enter judgment. *Id.* at 448. At the time, Section 153.0071 provided in pertinent part as follows:

> (d) A mediated settlement agreement is binding on the parties if the agreement:
> (1) provides, in a prominently displayed statement that is in boldfaced type or capital letters or underlined, that the agreement is not subject to revocation;
> (2) is signed by each party to the agreement; and
> (3) is signed by the party's attorney, if any, who is present at the time the agreement is signed.
> (e) If a mediated settlement agreement meets the requirements of Subsection (3), a party is entitled to judgment on the mediated settlement agreement notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law.
> (e-1) Notwithstanding Subsections (d) and (e), a court may decline to enter a judgment on a mediated settlement agreement if the court finds that:
> (1) a party to the agreement was a victim of family violence, and that circumstance impaired the party's ability to make decisions; and
> (2) the agreement is not in the child's best interest.

*Id.* at 451-52.[2]

The mother petitioned the court of appeals for a writ of mandamus ordering the trial court to enter judgment on the MSA. *Id.* at 449. The court of appeals denied the petition, holding that "the trial court [did] not commit[] a clear abuse of discretion in refusing to enter judgment on a mediated settlement agreement that [was] not in the child's best interest." *Id.*

Subsequently, the mother petitioned the supreme court for a writ of mandamus. *Id.* The father argued that, based on Section 153.002's mandate that "[t]he best interest of the child shall always be the primary consideration of the court in determining issues of conservatorship and possession," trial courts had discretion to void an MSA that was not in the child's best interest. *Id.* at 452. A divided court conditionally granted the mandamus relief and ordered the trial court to withdraw its order denying entry of judgment on the MSA. *Id.* at 461.

Justice Lehrmann delivered the court's opinion, joined in full by three justices and in part by Justice Guzman. In the opinion, Justice Lehrmann identified the sole issue as whether a trial court may deny a motion to enter judgment on a validly executed MSA based on a broad best interest inquiry. *Id.* at 450. The court held it may not. *Id.* at 457-58.

Justice Green filed a dissenting opinion, joined by three justices, identifying the issue as whether a trial court may deny such a motion based on a determination that the MSA endangers the child's safety and welfare and, thus, is not in the child's best interest. *Id.* at 468 (Green, J., dissenting). He opined that it may. *Id.*

Justice Guzman filed a concurring opinion addressing both issues. *Id.* at 461-66 (Guzman, J., concurring). She concurred with Justice Green, for a majority of the court, that a trial court does not abuse its discretion by refusing to enter judgment on an MSA that could endanger the safety and welfare of a child. *Id.* at 461. Her opinion diverged from Justice Green's in that she believed mandamus was appropriate in the case because the evidence of endangerment was legally insufficient to support the trial court's decision to set aside the MSA. *Id.* at 462.

In analyzing whether a broad best interest inquiry was appropriate before entering judgment on an MSA, the supreme court addressed the father's argument that despite Section

---

[2] The legislature has since added that a trial court may decline to enter judgment on an MSA if it finds that the agreement would permit a person with a history or pattern of physical or sexual abuse to reside in the same household as or have unsupervised access to the child, and the agreement is not in the child's best interest. TEX. FAM. CODE ANN. § 153.0071(e-1)(1)(B), (2) (West Supp. 2020).

153.0071's plain language, trial courts could consider the best interest of the child based on Section 153.002. *Id.* at 454 (majority opinion). It concluded that, to the extent the two statutes conflicted, the applicable rules of construction required a holding that Section 153.0071 prevailed. *Id.* First, the court reasoned that the use of the word "notwithstanding" indicated the legislature intended Section 153.0071 to control. *Id.* (citing *Molinet*, 356 S.W.3d at 413-14). Next, it observed that the specific statutory language of Section 153.0071(e) trumps Section 153.002's more general mandate. *Id.* at 455 (citing TEX. GOV'T CODE ANN. § 311.026(b); *Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 297 (Tex. 2011) (reiterating rule that specific statutory provisions prevail over general mandates)). Finally, the court observed that Section 153.0071 prevailed as the statute latest in date of enactment. *Id.* at 455 (citing TEX. GOV'T CODE ANN. § 311.025(a); *Jackson*, 351 S.W.3d at 297). For those reasons, the court held that "[S]ection 153.0071(e) encourages parents to peaceably resolve their child-related disputes through mediation by foreclosing a broad best interest inquiry with respect to entry of judgment on properly executed MSAs[.]" *Id.*

The concurring and dissenting opinions agreed that a broad best interest inquiry was inappropriate. *Id.* at 463 (Guzman, J., concurring), 470 (Green, J., dissenting). In explaining why a broad best interest inquiry is not required before entering judgment on an MSA, each opinion cites the presumption that fit parents act in the best interest of their children. *Id.* (citing *Troxel v. Granville*, 530 U.S. 57, 68, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000)). Justice Green, although disagreeing that the appropriateness of a broad best interest inquiry was the issue before the court, stated that he "would not hold that a trial court can refuse to enter judgment on an MSA based on any one of the factors we listed in *Holley v. Adams* as pertinent to a best interest determination."[3] *Id.* at 476 (Green, J., dissenting). He agreed that Section 153.0071 does not require a court to determine that an MSA is in a child's best interest before entering judgment on it and believed the lack of such a requirement makes sense because courts generally delegate to MSA parties the role of ensuring the child's best interest is protected. *Id.* at 470 (citing TEX. FAM. CODE ANN. § 151.001(a)(2) ("A parent of a child has the following rights and duties . . . the

---

[3] This nonexhaustive list of factors includes (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

duty of care, control, protection, and reasonable discipline of the child[.]")).  Justice Green believed that "courts, therefore, should refrain from performing a broad best interest inquiry or conducting a full evidentiary hearing on every MSA presented." *Id.* at 470.  Similarly, Justice Guzman "agree[d] with the Court that section 153.0071 in fact forecloses a broad best-interest inquiry," and opined that "[i]n doing so, the statute furthers the time-honored 'presumption that fit parents act in the best interests of their children.'" *Id.* at 463 (Guzman, J., concurring).

In analyzing whether a trial court could deny a motion to enter judgment on an MSA based on a determination that it would endanger the child's safety and welfare, Justice Green opined that when the court believes, based on evidence, that the parties executed an MSA without safeguarding the child's best interest, the presumption that the parties act in the child's best interest can be rebutted or negated.  *Id.* at 470 (Green, J., dissenting).  In this rare situation, the family code allows the court to ensure that the child's safety and welfare are protected by refusing to enter judgment on an MSA that places the child in danger.  *Id.*  In addition to the clear policy that courts must ensure protection of a child's best interest as defined in Sections 153.001 and 153.002, more than one hundred code sections contain specific provisions to protect children's best interests, reflecting that children's interests are to be paramount in legal proceedings and judges have the power to safeguard children from endangerment.  *Id.* at 471 & n.6 (citing provisions).  When reading Section 153.0071 in context and in harmony with these provisions, Justice Green could not conclude that the legislature intended the absurd result of disallowing courts discretion to reject an MSA that jeopardizes a child's safety and welfare.  *Id.* Justice Guzman agreed, for a majority of the court, that a contextual reading of the code allows a narrow inquiry into whether entering judgment on an MSA could endanger a child's safety and welfare, and that requiring a court to enter a judgment that could endanger a child would be an absurd result.  *Id.* at 463-64 (Guzman, J., concurring).

Our analysis of a trial court's duty under Section 153.009 is similar to the supreme court's analysis of a trial court's duty under Section 153.0071.  First, as Section 153.0071's plain language did not authorize a court to refuse to enter judgment on an MSA unless the family violence requirements were met, Section 153.009's plain language does not authorize a court to refuse to interview a twelve-year-old child after a party applies for such an interview.  *See id.* at 453 (majority opinion).  Next, as Section 153.0071's specific statutory language trumps Section 153.002's more general mandate, so does Section 153.009's specific statutory language.  *See id.*

at 455; *see also* TEX. GOV'T CODE ANN. § 311.026(b) (West 2013); *Jackson*, 351 S.W.3d at 297. Because Sections 153.002 and 153.009 were enacted at the same time, neither prevails as the statute latest in date of enactment. *See* Acts 1995, 74th Leg., ch. 20, § 1, eff. April 20, 1995; *Lee*, 411 S.W.3d at 455; *see also* TEX. GOV'T CODE ANN. § 311.025(a) (West 2013); *Jackson*, 351 S.W.3d at 297. Finally, as a broad best interest inquiry was not required under Section 153.0071 because courts presumed that the parties acted in the children's best interest when executing an MSA unless the family violence exception applied, a broad best interest inquiry is not required under Section 153.009 because courts also presume that a party acts in the child's best interest when applying for an in chambers interview. *See Lee*, 411 S.W.3d at 463 (Guzman, J., concurring), 470 (Green, J., dissenting); *see also* TEX. FAM. CODE ANN. § 151.001(a)(2); *Troxel*, 530 U.S. at 68. For these reasons, we conclude that trial courts should refrain from performing a broad best interest inquiry or conducting a full evidentiary hearing on every application for an in chambers interview with a child twelve years of age or older and would err to refuse to interview such a child based on a broad best interest inquiry. *See Lee,* 411 S.W.3d at 457-58 (majority opinion), 462 (Guzman, J., concurring), 470 (Green, J., dissenting).

We further conclude that when a court believes, based on evidence, that a party applied for an in chambers interview with a child without safeguarding the child's best interest, the presumption that the parties acted in the child's best interest can be rebutted or negated. *See* id. at 470 (Green, J., dissenting). We would therefore hold, similarly to a majority of the court in *Lee*, that in that situation, a contextual reading of the family code allows a narrow inquiry into whether interviewing a child in chambers could endanger the child's safety and welfare. *See id.* at 464 (Guzman, J., concurring), 471 (Green, J., dissenting). Requiring a trial court to interview a child when the interview could endanger his safety and welfare would be an absurd result. *See id.* Accordingly, when a court finds that an interview could endanger a child's safety and welfare, its refusal to conduct the interview is not error if the evidence is sufficient to support the finding. *See id.* at 464 (Guzman, J., concurring) (evidence was insufficient to support finding), 475 (Green, J., dissenting) (evidence was sufficient to support finding).

Having held that a trial court does not err by refusing to interview a child in chambers after a sufficiently supported finding that the interview would endanger the child's safety and welfare, we next determine whether the evidence in this case is legally sufficient to support such

a finding.[4] Evidence in support of the finding is abundant and includes evidence that tends to show C.R.D. was inappropriately involved in the litigation and that involvement was causing him severe emotional distress and resulting physical distress that was exacerbated by the prospect of talking to the judge in chambers.

The record reflects the court was concerned that conducting the interview could be detrimental to C.R.D. It heard considerable evidence as to the extent that C.R.D. was caught in the middle of the parents' ongoing disputes and the physical manifestations of stress and anxiety he exhibited when brought to the courthouse to be interviewed. Thigpen's closing arguments addressed how C.R.D. was involved in the parents' dispute and litigation, he put himself in the middle of the dispute, and his anxiety and depression symptoms are "so far down the road of trauma that that's not going to get any better." He reurged that C.R.D. not be required to talk to the court.

An amicus attorney is "an attorney appointed by the court in a suit . . . whose role is to provide legal services necessary to assist the court in protecting a child's best interests[.]" TEX. FAM. CODE § 107.001(1) (West 2019). Among other duties, an amicus attorney must

> (B) seek to elicit in a developmentally appropriate manner the child's expressed objectives of representation;
>
> (C) consider the impact on the child in formulating the attorney's presentation of the child's expressed objectives of representation to the court;
>
> (D) investigate the facts of the case to the extent the attorney considers appropriate; [and]
>
> . . . .
>
> (G) take any action consistent with the child's interests that the attorney considers necessary to expedite the proceedings[.]

*Id.* 107.003(a)(1)(B), (C), (D), (G) (West Supp. 2020). The amicus attorney is appointed to assist the court, not to represent the child or either of the parents. *Zeifman v. Nowlin*, 322 S.W.3d 804, 808 (Tex. App.—Austin 2010, no pet.). Therefore, it is the trial court, not the parties, to whom the amicus attorney is responsible for the limited purposes delineated in the statute. *Id.* In charging an amicus attorney with these duties, the legislature clearly intended

---

[4] The trial court's statement that "there is ample evidence that this child was traumatized by the thought of coming to talk to me, and I'm not going to put that child in that position" sufficiently indicates it made this finding.

trial courts to consider the amicus attorney's presentation of facts related to the child's interests in making its determinations. *See id.* Thigpen was an officer of the court and appointed as an amicus attorney to assist the court in protecting the children's best interests. Thus, the trial court would not have erred by considering Thigpen's statements in determining whether an interview in chambers would endanger C.R.D.'s safety and welfare. Moreover, the trial court would not have reversibly erred by considering Thigpen's statements even if such consideration was improper because J.L.D. did not object to either the statements or the trial court's consideration of them. *See* TEX. R. APP. P. 33.1(a)(1).

In addition to Thigpen's statements above regarding C.R.D.'s anxiety, depression, and physical symptoms—particularly on the day he was scheduled to talk to the judge and felt sick in the hallway, Thigpen offered other statements that support the trial court's determination that the interview would endanger C.R.D.'s safety and welfare. C.R.D. told Thigpen that J.L.D. showed him the court's previous order. He was also shown screenshots of J.L.D. telling S.E.J.M. which injunctions she violated. C.R.D. further knew that the injunctions were referred to as the "Bishop injunctions."

In addition to Thigpen's statements, other evidence supports the trial court's determination. Some of this evidence tends to further show that C.R.D. was inappropriately involved in the litigation. First, Surratt testified that when she spoke with C.R.D. about talking to the judge, he expressed a belief that because he was twelve years old, he could choose which parent he lived with. Furthermore, although J.L.D. denied showing C.R.D. the injunctions, he admitted telling C.R.D. that S.E.J.M. must tell him when the children have doctor's appointments. He also admitted that he showed C.R.D. a text message he sent to S.E.J.M. asking her why she did not tell him about one of the children's doctor's appointments. Russell Bailiff, a private therapist who saw the children several times in late 2018 and early 2019, testified that showing C.R.D. the injunctions or telling him when a parent has violated them could exacerbate his anxiety.

Additionally, Bailiff gave further testimony about C.R.D.'s mental state that supports the trial court's determination. He testified that when he was seeing the children, he was concerned about their level of preoccupation with parental strife. C.R.D. showed symptoms of anxiety based on the parents' fighting. He also had symptoms of depression secondary to his anxiety. In one session, C.R.D. was under so much stress that he was exhibiting unique dysregulated motor

movements and took a considerable amount of time to calm down. Although Bailiff believed that an interview with the judge in chambers would "probably be helpful" to C.R.D., he also agreed that it could be "putting him back in the middle of things."

Finally, Surratt provided further testimony supporting a determination that an interview would endanger C.R.D.'s safety and welfare. She believed that C.R.D. had severe anxiety about the case. When C.R.D. was experiencing a high level of anxiety, he showed physical symptoms including rubbing his stomach as if he were sick and vomiting. Regarding a possible interview in chambers, he was nervous that his parents would find out what he said and afraid he would hurt their feelings.

In concurring with Thigpen's recommendation against interviewing C.R.D. when he was brought to the courthouse, the court stated, "This is a child welfare court, so our desire is to protect children from trauma at all costs." Considering the extensive evidence of C.R.D.'s inappropriate involvement in the case, emotional trauma, resulting physical symptoms, the ongoing nature of the trauma and symptoms, and the relationship between increased trauma symptoms and the interview in chambers, we could not conclude that the trial court abused its discretion by finding that an interview in chambers would endanger C.R.D.'s safety and welfare and refusing to interview him even if the complaint were properly preserved on appeal. *See Lee*, 411 S.W.3d at 463-64 (Guzman, J., concurring), 466 (Green, J., dissenting). Accordingly, we overrule J.L.D.'s first issue.

### FAILURE TO FILE FINDINGS OF FACT AND CONCLUSIONS OF LAW

In J.L.D.'s second issue, he argues that the trial court erred by failing to file findings of fact and conclusions of law, and that the error is harmful.

**Applicable Law**

Any party may file a request for findings of fact and conclusions of law in any case tried without a jury within twenty days after the judgment is signed. TEX. R. CIV. P. 296. If the trial court fails to respond to the request within twenty days, the requesting party must file a notice of past due findings of fact and conclusions of law within thirty days of the original request. TEX. R. CIV. P. 297. A party who fails to file such a notice or files it untimely waives any complaint on appeal of the trial court's failure to file findings of fact and conclusions of law. *In re S.M.*, 616 S.W.3d 53, 59 (Tex. App.—Tyler 2020, no pet.).

**Analysis**

In this case, the record shows that J.L.D. timely filed a request for findings of fact and conclusions of law on April 6, 2020, four days after the trial court's order was signed. *See* Tex. R. Civ. P. 296. The record further shows that J.L.D. untimely filed a notice of past due findings of fact and conclusions of law thirty-seven days later on May 13. *See* Tex. R. Civ. P. 297. No written findings of fact and conclusions of law appear in the record.

On appeal, J.L.D. concedes that he missed the deadline for filing his notice of past due findings of fact and conclusions of law but contends the notice was nonetheless timely because the Texas Supreme Court extended the deadline to July 15. In support of this contention, he cites the following language from the Texas Supreme Court's Twelfth Emergency Order Regarding the COVID-19 State of Disaster:

> 3. Subject only to constitutional limitations, all courts in Texas may in any case, civil or criminal—and must to avoid risk to court staff, parties, attorneys, jurors, and the public—without a participant's consent:
>
> a. Modify or suspend any and all deadlines and procedures, whether prescribed by statute, rule, or order, specifically including those in Section 263.401 of the Family Code and in all proceedings under Subtitle E, Title 5, of the Family Code, for a stated period ending no later than 30 days after the Governor's state of disaster has been lifted;
>
> . . . .
>
> 5. Any deadline for the filing or service of any civil case that falls on a day between March 13, 2020, and June 1, 2020, is extended until July 15, 2020. This does not include deadlines for perfecting appeal or for other appellate proceedings, requests for relief from which should be directed to the court involved and should be generously granted.

*Twelfth Emergency Order Regarding the COVID-19 State of Disaster*, Misc. Docket No. 20-9059, ¶¶ 3, 5 (Tex. Apr. 27, 2020).

We fail to see why J.L.D. concludes that this order extended the deadline for filing his notice of past due findings of fact and conclusions of law. Under Paragraph 3 of the order, deadline modification was mandatory only if meeting the current deadline would cause risk to court staff, parties, attorneys, jurors, or the public; otherwise, deadline modification was discretionary. *See id.* ¶ 3. J.L.D. names no risk that filing his past due notice within thirty days of his original request would have caused, and we know of none. Thus, we cannot conclude that deadline modification was mandatory under Paragraph 3. *See id.* Furthermore, J.L.D. gives no reason why the trial court's failure to employ its discretion to modify the deadline constitutes an

15

abuse of discretion, and we know of none. Therefore, we cannot conclude that the trial court abused its discretion by failing to modify the deadline under Paragraph 3. *See id.*

Nor can we conclude that the deadline was extended under Paragraph 5 of the order. J.L.D. does not explain how filing a notice of past due findings of fact and conclusions of law constitutes "the filing or service of [a] civil case," and we conclude that it does not. *See id.* ¶ 5. Because the deadline was not modified by the supreme court's emergency order, we conclude that J.L.D.'s past due notice was untimely, and his complaint that the trial court erred by failing to file findings of fact and conclusions of law is waived on appeal. *See **S.M.**,* 616 S.W.3d at 59. Accordingly, we overrule J.L.D.'s second issue.

## PRIOR RESTRAINT ON FREE SPEECH

In part of J.L.D.'s third issue, he argues that the trial court's injunctions against discussing the case, conservatorship, possession, or support with the children constitute an impermissible prior restraint on the parties' right to free speech guaranteed under Article I, Section 8 of the Texas Constitution.

Before a complaint may be presented for appellate review, the record must show that it was made to the trial court by a timely request, objection, or motion. TEX. R. APP. P. 33.1(a)(1). J.L.D. did not argue in the trial court that any of the injunctions constituted a prior restraint on his right to free speech under Article I, Section 8 of the Texas Constitution and, therefore, has failed to preserve his complaint for our review. *See id.*; ***In re S.V.***, 599 S.W.3d 25, 40 (Tex. App.—Dallas 2017, pet. denied).

Furthermore, even if J.L.D.'s complaint was preserved, we could not grant him relief. As S.E.J.M. observes in her brief, the injunctions against discussing the case, conservatorship, possession, or support with the children were not newly imposed but were included in the agreed order. A party cannot complain on appeal that the trial court took a specific action the complaining party requested, a doctrine known as the invited error doctrine. ***Tittizer v. Union Gas Corp.***, 171 S.W.3d 857, 862 (Tex. 2005). Because J.L.D. agreed to the injunctions and asked the trial court to impose them, he cannot complain on appeal that the trial court took the action he requested. *See id.*

For the reasons discussed above, we overrule the portion of J.L.D.'s third issue complaining of an infringement on his right to free speech.

16

Also in J.L.D.'s third issue, he argues that the sanction for injunction violation exceeds the amount allowed by law. He further argues that the trial court's prejudgment of punishment for injunction violation contravenes due process.

Before a complaint may be presented for appellate review, the record must show that it was made to the trial court by a timely request, objection, or motion. TEX. R. APP. P. 33.1(a)(1). J.L.D. did not argue in the trial court that the sanctions are excessive or that their preassessment by the trial court violates his right to due process. Therefore, he has failed to preserve these complaints for our review. *See id.*

Furthermore, even if the complaints were preserved, we could not address them because they are not ripe for our review. The courts of this state are not empowered to give advisory opinions. ***Patterson v. Planned Parenthood of Houston & Se. Tex., Inc.***, 971 S.W.2d 439, 443 (Tex. 1998). This prohibition extends to cases that are not yet ripe. *Id.* A case is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass. *Id.* In this case, J.L.D. does not claim that the sanction has been levied against him. Consequently, we conclude that the complaint is not ripe and we cannot give an advisory opinion in the matter. *See id.*

For the reasons discussed above, we overrule the portion of J.L.D.'s third issue complaining of the preassessment and amount of sanctions.

## MODIFICATION OF POSSESSION SCHEDULE

In part of J.L.D.'s fourth issue, he argues that the trial court erred by modifying his periods of possession and access.

### Standard of Review and Applicable Law

A trial court may modify an order that provides for periods of possession and access if modification would be in the best interest of the child and

> the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the earlier of:
>
> (A) the date of the rendition of the order; or
>
> (B) the date of the signing of a mediated or collaborative law settlement agreement on which the order is based[.]

TEX. FAM. CODE ANN. § 156.101(a)(1) (West 2014). We review such a modification for an abuse of discretion. *In re H.D.C.*, 474 S.W.3d 758, 763 (Tex. App.—Houston [14th Dist.] 2014, no pet.). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Id.*

It is the factfinder's role to resolve evidentiary conflicts and determine the weight and credibility of witness testimony. *Lilley v. Lilley*, 43 S.W.3d 703, 705 (Tex. App.—Austin 2001, no pet.). As long as some evidence of a substantive and probative character exists to support the trial court's decision, we will find no abuse of discretion. *H.D.C.*, 474 S.W.3d at 763.

**Analysis**

J.L.D. argues that the trial court abused its discretion by modifying his possession and access periods because there is no evidence either of a substantial change in circumstances or that the modification is in the best interest of the children. We disagree.

Although J.L.D. now argues that there is no evidence of a substantial change in circumstances, he alleged in his counterpetition that "[t]he circumstances of the children, a conservator, or other party affected by the order to be modified have materially and substantially changed since the date of the signing of the mediated settlement agreement on which the order to be modified is based." One party's allegation of changed circumstances of the parties constitutes a judicial admission of the common element of changed circumstances of the parties in the other party's similar pleading. *In re A.E.A.*, 406 S.W.3d 404, 410 (Tex. App.—Fort Worth 2013, no pet.). Admissions in trial pleadings are judicial admissions in the case in which the pleadings are filed. *Id.* The facts judicially admitted require no proof and preclude the introduction of evidence to the contrary. *Id.* A judicial admission is conclusive upon the party making it, relieves the opposing party's burden of proving the admitted fact, and bars the admitting party from disputing it. *Hennigan v. I.P. Petroleum Co., Inc.*, 858 S.W.2d 371, 372 (Tex. 1993). Because J.L.D. judicially admitted the substantial change in circumstances in his counterpetition, he is barred from challenging the trial court's finding of a substantial change in circumstances on appeal. *See A.E.A.*, 406 S.W.3d at 410; *Hennigan*, 858 S.W.2d at 372.

Regarding the best interest determination, we cannot say the trial court abused its discretion by finding that the modification is in the children's best interest. The trial court heard abundant evidence about the inordinate amount of stress the children were enduring, and abundant evidence from which the court could conclude that J.L.D.'s actions were a major cause

of that stress.  First, the record contains evidence that J.L.D. frequently spoke to the children about his relationship with S.E.J.M.  She testified that every time the children return from J.L.D.'s house, B.R.D. says

> Mom, he moved down here for you. He—he was engaged to Ms. Sophia, and he left her for you. And, you know, you—you don't want to be with him. And he just loves you more than anything, and he just wants our family back. And he doesn't understand why you don't love him anymore and why—why you don't want our family back. And—and he'll do anything, Mom. He'll—he'll do anything for you.

S.E.J.M. asked C.R.D. whether J.L.D. cries, and he said, "Yeah. Daddy still cries. And it hurts, and I don't—I don't know what—what to do when he does, so I just kind of walk away." Although J.L.D. denied telling the children he wants his family back, he admitted telling them that S.E.J.M. "chose Sebastian."[5]

Other evidence shows that J.L.D. was speaking to the children about the litigation. Thigpen told the trial court that the children said they saw the court order, and C.R.D. said J.L.D. showed it to him.  J.L.D. denied showing C.R.D. the injunctions but admitted he told C.R.D. that S.E.J.M. has to tell him when the children have doctor's appointments.  He further admitted that he showed C.R.D. a text message he sent to S.E.J.M. asking her why she did not tell him about one of the children's doctor's appointments.  The foregoing evidence supports the trial court's determination that J.L.D.'s participation in counseling regarding appropriate conversation boundaries with the children is in the children's best interest.

Further evidence supports the trial court's determination that J.L.D.'s participation in coparenting consultation is in the children's best interest. The evidence tends to show that J.L.D. regularly accuses S.E.J.M. of injunction violation and other arguably bad conduct while simultaneously violating injunctions and engaging in arguably bad conduct.  J.L.D. testified that S.E.J.M. violated the court order by refusing to allow the children to call him at specified times, allowing Sebastian to remain in the home after 8:00 p.m., allowing the children to stay at Sebastian's home overnight, and failing to inform him of doctor's appointments and

---

[5] The record shows that Sebastian was S.E.J.M.'s fiance at the time of trial.

parent/teacher conferences. In response to these perceived transgressions,[6] J.L.D. sent the following excoriating messages to S.E.J.M. via the Our Family Wizard[7] application:

(1) Here is a copy of our order in case you've forgotten.

Sebastian is not allowed nor does he have authority in any way shape or form to give corporal punishment "push ups", to our children for any reason!

This is and has been a continued violation of our orders! I suggest you fix this immediately!

In addition; if [sic] I do not want to hear from our children ever again of how poorly Sebastian treats them, or that he screams at them, for any reason.

This is a violation of the Karen Bishop injunctions in our orders.

(2) Per our orders the kids are to [sic] to be overnight with a person whom you're romantically involved. Attached is the injunction in our order.

Lol, and the kids busted you smoking! After you made me quit and after your dad died of cancer. Wow

Live your life as you please, all I ask is that you abide by the orders you signed and agreed to.

(3) Sebastian is not their father and he never will be. He is the man you got caught cheating with and always will be.

Don't forget how you, your mother, and Amy Hobbs terrorized Sophea and I for a year until you ran her off.

You have spent NO quality time with our children at all this whole summer, and now you have Sebastian send them letters... wow! He is not their fath [sic] He is not their parent: He is a home wrecker, that destroyed their family.

(4) I find it very amusing that you expect and demand that I abide by the orders, but you don't think you have to. How many injunctions are you going to continue to violate?

Despite J.L.D.'s vehement demands that S.E.J.M. follow the injunctions, other evidence tends to show that J.L.D. violated various injunctions. First, he allowed his friend Maddi to stay overnight with him and the children on their beach vacation. Although J.L.D. claimed that he

---

[6] S.E.J.M. admitted only to failing to inform J.L.D. of one doctor's appointment.

[7] Our Family Wizard is a website designed to facilitate communications between divorced or separated parents. *See* OUR FAMILY WIZARD FEATURES IN REVIEW, https://www.ourfamilywizard.com/about-us/OFW-review-for-parents.

and Maddi were not romantically involved, a private investigator hired by S.E.J.M testified that he observed them at the beach and could tell they were more than just friends. Moreover, J.L.D. admitted taking the children to a second counselor without informing S.E.J.M. Finally, S.E.J.M. testified that J.L.D. violated the order to communicate through Our Family Wizard by calling and yelling at her over the phone. She hung up the phone, and he called her back and left an excoriating voice message, which was admitted into evidence. Based on the foregoing evidence, the trial court could have reasonably found that coparenting consultation for these parents is in the best interest of the children.

Under the circumstances of this case, we cannot say that the trial court abused its discretion by reducing J.L.D.'s possession time and requiring that he participate in counseling and coparent consultation before his possession time is increased. *See H.D.C.*, 474 S.W.3d at 763. Accordingly, we overrule this part of J.L.D.'s fourth issue.


### CONDITIONAL GRANT OF EXPANDED POSSESSION ORDER

Also in J.L.D.'s fourth issue, he argues that the trial court erred by conditioning its grant of the expanded standard possession order on his performance of impossible acts or acts the possibility of which depends on the acts of others.

**Conditioning Grant on Impossible Acts**

First, J.L.D. claims that the trial court erred by conditioning his grant of the expanded standard possession order on his participation in counseling sessions with Georgia Beard because his participation became impossible when Beard declined to counsel him. We disagree.

The trial court orally pronounced its order for J.L.D. to participate in counseling with Beard on January 15, 2020, and signed the written order on April 2. The written order states that "within seven (7) days from the entry of this order, [J.L.D.] shall contact Georgia Beard, 13359 Hwy. 155, Tyler, Texas, 75703, (903) 266-1030, to schedule his initial appointment." On April 15, J.L.D. filed his "First Supplemental Motion to Modify, Correct, or Reform Judgment and Motion for New Trial," claiming in part that it is impossible for him to comply with the order to participate in counseling with Beard because she declined to perform the required services. He attached to his motion a letter purportedly from Beard. The letter is dated April 14 and reads as follows:

21

As of April 1, 2020, I will no longer be accepting new clients. Due to the Covid 19 Mitigation rules, our offices are closed, and we are only connecting with clients virtually. I am sorry if this is an inconvenience. Since we have been recommended through the court system, we can recommend another therapist if necessary.

The record contains no indication that J.L.D. requested a hearing on the motion or that the trial court expressly ruled on the motion.

J.L.D. has failed to preserve this issue for our review. In general, to preserve a complaint for appellate review, the record must show that "the complaint was made to the trial court by a timely request, objection, or motion" and that "the trial court . . . ruled on the request, objection, or motion, either expressly or implicitly . . . or . . . refused to rule on the request, objection, or motion, and the complaining party objected to the refusal." TEX. R. APP. P. 33.1(a). In a civil case, the overruling by operation of law of a motion for new trial or a motion to modify the judgment preserves for appellate review a complaint properly made in the motion, unless taking evidence was necessary to properly present the complaint in the trial court. *Id.* 33.1(b).

Although the record before us contains J.L.D.'s motion for new trial raising the impossibility issue, and the motion was overruled by operation of law, the overruling of the motion did not preserve J.L.D.'s complaint for our review because taking evidence was necessary to properly present the complaint in the trial court. *See id.* The letter attached to the motion alone is insufficient to establish that Beard declined to perform the services for J.L.D. because it is unauthenticated and contains no addressee. J.L.D. did not request an evidentiary hearing and does not argue on appeal that the trial court should have held a hearing on the motion. Because taking evidence was necessary to properly present the complaint in the trial court, the overruling by operation of law of J.L.D.'s motion for new trial did not preserve his issue for our review. *See* TEX. R. APP. P. 33.1(b). Similarly, even if we were to review this issue, we could not grant J.L.D. relief because insufficient evidence exists in the record to support his claim. Accordingly, we overrule this part of J.L.D.'s fourth issue.

**Conditioning Grant on Acts that Depend on Others**

Next, J.L.D. claims that the trial court erred by conditioning his grant of the expanded standard possession order on his participation in coparenting sessions because his attendance at the sessions requires S.E.J.M.'s attendance and payment. Again, we disagree. Nothing in the trial court's oral pronouncement or written order indicates that J.L.D. would not be able to

participate in the coparenting sessions if S.E.J.M. failed to attend or make her payments. Accordingly, we conclude that this part of J.L.D.'s fourth issue lacks merit, and we overrule it.

### DISPOSITION

Having overruled Appellant's first, second, third, and fourth issues, we ***affirm*** the trial court's judgment.

**BRIAN HOYLE**
Justice

Opinion delivered August 25, 2021.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

23



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**AUGUST 25, 2021**

**NO. 12-20-00143-CV**

**IN THE INTEREST OF C.R.D. AND B.R.D., CHILDREN**

Appeal from the 321st District Court
of Smith County, Texas (Tr.Ct.No. 18-2165-D)

        THIS CAUSE came to be heard on the appellate record and brief(s) filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

        It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, all costs of this appeal are assessed against the Appellant., **J.L.D**., and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*