# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-20-00550-CV

---

**Andrew C. Pore, Appellant**

**v.**

**Cheyenne Ellis, Appellee**

---

### FROM THE 119TH DISTRICT COURT OF RUNNELS COUNTY
### NO. 15,985, THE HONORABLE BEN WOODWARD, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Andrew C. Pore (Father) appeals from the trial court's Order in Suit Affecting the Parent-Child Relationship (SAPCR) establishing a joint managing conservatorship between him and Cheyenne Ellis (Mother) regarding their child, M.E. (Child). The order grants Mother the exclusive right to designate Child's primary residence and to receive and spend child support. Father contends that the trial court abused its discretion by awarding Mother the right to designate Child's primary residence. We will affirm the judgment.

### BACKGROUND

Child was born on August 17, 2018, nine months after her parents' sole date. Mother barred Father from the birth because he questioned whether he was Child's father and accused Mother of drinking while pregnant, among other disagreements. Mother allowed her then-boyfriend to attend because he had completed drug rehabilitation two weeks earlier. Two

weeks later, she obtained a restraining order against that by-then ex-boyfriend; she has not seen the ex-boyfriend since then. Child lived with Mother, her mother, and her mother's fiancé. Mother has two older children with different fathers, and Father has an older child with a different mother. Mother's older children were primarily with her, albeit on a return monitored by the Department of Family and Protective Services (DFPS[1]) at the time of the hearing, while Father had visitation rights with his older child.

In October 2018, Father attended a barbecue with Mother's family. Mother and her sister testified that Father arrived with beer and liquor, consumed both, then drove away while intoxicated with Mother in the vehicle; they said he pulled over and let Mother finish the drive. Father denied drinking alcohol or driving while intoxicated that night; he also denied that Mother has ever driven his vehicle. He said that he spent most of that evening with Child.

In December 2018, Father filed this SAPCR to establish paternity and conservatorship. Three days before the temporary-orders hearing, Mother told Father she was not hired for a job because she failed a urinalysis. On February 1, 2019, the court held a hearing on temporary orders and made a docket entry naming the parents joint managing conservators, giving Mother the right to designate Child's residence within a defined area, with visitation on the second Saturday of the month from noon to 3 p.m. or by agreement. Father did not visit on his designated Saturday in February, but reportedly went to Mother's home on Tuesday, February 26, 2019, at 9 p.m. Mother and her mother testified that he was yelling that Child was dead and that eventually they called the police alleging criminal trespass; Father denied yelling that Child was dead.

---

[1] The parties refer to both the DFPS and Child Protective Services (CPS) seemingly interchangeably. We will refer to both under the umbrella of DFPS.

On March 9, 2019, Mother and Child tested positive for methamphetamine; her older children tested negative. On March 13, 2019, Mother was arrested for possession of methamphetamine. Mother testified that Father did not attend his March visitation day but showed up the day after her arrest—a Thursday—demanding Child. She testified that she kept Child because they were being offered family-based services.

On April 13, 2019, his designated visitation day, Father went to Mother's home and took Child with him to his home with his parents and kept her there for several months despite having no court order authorizing him to designate the child's primary residence.[2] In May 2019, the trial court signed temporary orders reiterating its docket entry from the February 1 hearing granting Mother the exclusive right to establish Child's primary residence.

In a separate case, DFPS removed Mother's older children from her care in July 2019, possibly because of an altercation between Mother and her mother. At some point, Mother was diagnosed with post-partum depression and polycystic ovary syndrome (PCOS), which she testified caused pain and mood issues. Mother was processed through drug court for her drug possession charge and began accessing services through DFPS that were not detailed in this record.

On August 8, 2019, Father filed a motion to modify temporary orders requesting to be named temporary sole managing conservator of Child. On August 16, 2019, the court designated Father as the temporary joint managing conservator with the right to designate the residence of Child, removing that right from Mother; the court ordered that Mother's access to

---

[2] Father's "parents" were technically his guardians or foster parents, but they had raised him since he was five years old.

3

Child be only by mutual agreement. Only one such visit occurred, supervised by a counselor at a neutral site.

On October 16, 2019, Mother filed a motion to modify temporary orders. On December 2, 2019, the parties filed a Rule 11 agreement permitting Mother two one-hour visits each month. The visits were to be arranged through Father's mother, who was one of the approved supervisors of the visit. Mother's relatives were not allowed to attend her visits. Meanwhile, DFPS implemented an eight-week monitored return of Mother's older children beginning July 2, 2020. Some visits with Child occurred, including an August 8, 2020 visit at which Mother recorded part of a conversation with Father to "show people, like, how he talks to me." During the recorded portion of the conversation, Father persisted in talking about the potential result of their upcoming hearing. Despite Mother's request not to talk about their dispute, Father recounted Mother's arrest and asserted that she "gave our daughter meth" seventeen months earlier, expressed disbelief that she was contesting the custody arrangement, and opined that she had "zero percent chance of ever" getting Child to be in her home. As Mother continued to interact with the children, she denied giving Child meth and requested that he not talk about her past, saying "you don't think I know what happened?"

The court held the hearing that underlies this appeal on August 19, 2020. The trial court signed the appealed order September 21, 2020, designating the parties as joint managing conservators and giving Mother the right to establish Child's primary residence. The court imposed a transition period from September 2020 through January 15, 2021, during which the parties alternated full weeks of possession, which then gave way to a standard possession order. Father appealed.

4

## STANDARD OF REVIEW

Courts' primary concern when considering issues of conservatorship and possession is the best interest of the child. Tex. Fam. Code § 153.002. No bright-line rule to determine what is in the child's best interest exists; each case is decided on its unique set of facts. *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002).

We review a trial court's decision on issues of conservatorship and possession of a child for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). The test is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action; a trial court abuses its discretion if it acts without reference to any guiding rules and principles such that the ruling is arbitrary or unreasonable. *Cire v. Cummings*, 134 S.W.3d 835, 838-39 (Tex. 2004); *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.). We must give wide latitude to a trial court's decisions on custody, control, possession, child support, and visitation, and will reverse the order only if it appears from the record as a whole that the trial court abused its discretion. *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). A trial court does not abuse its discretion simply by deciding an issue differently than an appellate court would under similar circumstances, and an abuse of discretion does not occur if some evidence of a substantive and probative character exists to support the trial court's decision. *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied).

In family-law cases, the abuse-of-discretion standard overlaps with traditional evidentiary-sufficiency standards of review. *Id.* at 587-88. Challenges to legal and factual sufficiency are not independent grounds of error but are relevant to deciding whether the trial court abused its discretion. *Id.* at 587; *see also Coburn*, 433 S.W.3d at 823. We use a two-

pronged inquiry to make this decision: (1) whether the trial court had sufficient information upon which to exercise its discretion, and (2) whether the trial court erred in its application of that discretion. *Zeifman*, 212 S.W.3d at 588 *see also Coburn*, 433 S.W.3d at 823.

To determine if the evidence is legally sufficient to support the trial court's exercise of discretion, we consider the evidence in the light most favorable to the trial court's findings if a reasonable factfinder could and disregard evidence to the contrary. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 826-27 (Tex. 2005). When reviewing the evidence for factual sufficiency, we consider and weigh all the evidence presented and will set aside the trial court's findings only if they are so contrary to the overwhelming weight of the evidence such that they are clearly wrong and unjust. *Id*. at 826. "[A]n abuse of discretion does not occur as long as some evidence of a substantive and probative character exists to support the trial court's decision." *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.).

Conservatorship determinations are "intensely fact driven," *Lenz*, 79 S.W.3d at 19, and the trial court is in the best position to observe the witnesses and "can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record," *Echols*, 85 S.W.3d at 477. The factfinder resolves evidentiary conflicts and determines the weight and credibility of witnesses. *See Lilley v. Lilley*, 43 S.W.3d 703, 705 (Tex. App.—Austin 2001, no pet.); *see also Anderson v. Durant*, 550 S.W.3d 605, 616 (Tex. 2018). A factfinder's decision on conflicts in the evidence is generally viewed as conclusive. *Lilley*, 43 S.W.3d at 705-06.

Determination of the best interest of the child is guided by the non-exclusive list of factors set out in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors are detailed below with the discussion on this issue.

6

By his sole remaining issue on appeal,[3] Father contends that the trial court abused its discretion in awarding Mother primary custody, which he describes as the right to determine Child's domicile. He contends that Mother's substance abuse, domestic violence in her home, the removal of other children from her home, and history of minimal, supervised visitation with Child meant that the trial court abused its discretion by establishing Child's primary residence with her.

Father challenges several of the findings of fact and conclusions of law and their subparts; such challenges go to the overarching question of whether the trial court abused its discretion. We will review the evidentiary basis for the findings of fact and conclusions of law as part of our evaluation of the exercise of its discretion. *Zeifman*, 212 S.W.3d at 588.

**Findings of fact and conclusions of law**

Father recites the standards for both factual and legal sufficiency as part of his challenge, so we will review the record and findings using both standards. For ease, when we refer to whether the record supports a finding below, that is shorthand for whether the finding is supported by legally and factually sufficient evidence.

Father challenges Finding 3, which states "that Father intentionally deprived Mother of access" to Child, to the extent it describes his conduct as wrongful and not in the best

---

[3] The trial court did not originally make findings of fact and conclusions of law as Father requested. Father assigned that failure as error. This Court abated this appeal and remanded to the trial court to make the findings and conclusions. After the trial court made the requested findings and conclusions, we reinstated the appeal, and the parties filed supplemental briefs.

7

interest of Child, and contests some of the subfindings.[4]  Father undisputedly took Child without benefit of a court order, and Mother had only one visit with Child from April 2019 to December 2019.  Father did not dispute Mother's sister's testimony that he said he wanted to keep Mother away from Child in 2019.  Even if Father limited Mother's visits to protect Child, the finding that he intentionally deprived Mother of access is supported by the record.

Father disputes the statement in Finding 3b that "[e]vidence is disputed concerning events between February 2019 and early summer, 2019."  He challenges Finding 3b(iii) concerning the events of April 13, 2019.  Finding 3b(iii) states

> Father testified that DFPS had called him to get the child, but other witnesses provided a different scenario. Father had come to the house on February 26, 2019 around 9:00 p.m. The police were called. Father was given a Criminal Trespass and left. He returned on April 13, 2019, pushed into the house and took the child.

While no representative of DFPS contradicted Father's report that the agency called him, Finding 3b(iii) is more expansive than that issue.  Father disputed testimony that his yelling that Child was dead on February 26, 2021 preceded the criminal trespass citation.  Because Finding 3b(iii) includes a "scenario" beyond the events of April 13, the record supports the finding that other witnesses "provided a different scenario" than Father did.  The record supports Finding 3b that evidence is disputed about events between February 2019 and early summer 2019.

---

[4]  Father mentions some findings seemingly without assigning them as errors requiring reversal.  He discusses Finding 3a but does not mention any particular quibble with it.  Finding 3a recites a partial procedural history of this case.  Father's brief mentions additional orders that the trial court listed in Findings 3d and 3f, which Father does not dispute.  There are some discrepancies between the dates Father recites and the dates of the trial court's orders, but none is assigned as error on appeal.

Father disputes Finding 3c, which states that Father took Child "in violation of the Court's temporary order, without the benefit of another court order, and without assistance of DFPS." The outcome of the February 2019 custody hearing was memorialized by a docket entry and by an order filed May 5, 2019—nearly a month after Father took Child—that both awarded Mother the exclusive right to designate the primary residence of the child within Runnels and contiguous counties. Father does not deny going to Mother's house alone and taking Child away; his testimony that he did so to protect Child and that DFPS called him does not rebut the evidence that he came alone and did not have a court order authorizing his action. The court gave Mother the right to determine Child's residence on February 1, 2019, and no further hearing occurred on the Child's residence until August 2019; the trial court made the docket entry authorizing Father to designate Child's residence on August 16, 2019, and the written temporary order was signed September 10, 2019. Finding 3c accurately reflects the absence of a court order authorizing his removal of Child and absence of evidence that DFPS assisted his physical removal of Child from Mother's home. The record supports Finding 3c.

Father contests Finding 4 and two subparts. Finding 4 states that Mother has "addressed" her criminal charges and DFPS problems "by successfully completing drug court and by completing all that DFPS required of her." Father asserts that this overstates Mother's progress, and the trial court's sub-findings confirm that assertion. In Finding 4a, the trial court found that Mother had completed "most" stages of the program and was "expected" to graduate; Mother testified that she would not complete the final phase until December 2020. Similarly, Finding 4b that the DFPS case was "expected to be dismissed shortly after this trial" is supported by Mother's testimony that she "hoped" the DFPS case would close after completion of the eight-week monitored-return phase. Mother testified that the monitored return began July 2,

9

2020—contrary to Finding 4b's language that the monitored return began in April 2020—meaning that the eight-week period would end on August 27, 2020, shortly after the August 19, 2020 hearing. While the preamble of Finding 4 somewhat overstates Mother's progress in other cases,[5] the record supports the trial court's subfindings regarding the still-pending status of the drug-court and DFPS cases at the time of the hearing in this case.

Father disputes Finding 5 that he has an alcohol problem that he has not addressed. The trial court listed two illustrative incidents—that the parties met at a bar and that Father got drunk at a 2018 family barbecue. These events both occurred while Father was on probation for felony evading arrest with a motor vehicle, which included a provision that he abstain from alcohol. Father testified that he had not had an alcoholic beverage since that 2016 arrest. There is no evidence about Father drinking in 2019 or 2020, nor of any alcohol-fueled misbehavior. The court's statement that Father had not addressed his alcohol problem and never participated in DFPS services because Child was never taken into DFPS custody is not challenged, except that Father denies he has an alcohol problem. The 2017 and 2018 situations the trial court listed are supported by the record, and his reported driving while intoxicated with Mother (and possibly Child) is illegal. But the evidentiary support for the conclusion that Father "has an alcohol problem" in 2020 is tenuous at best.

Father disputes Finding 6 that "[t]here is credible evidence that Father is not the primary caretaker of this child when he has had possession." Father accurately recites testimony from his parents that he is involved in Child's care when he is at home, and the evidence that he

---

[5] The trial court may have learned of the final resolution of the drug court and the DFPS case involving Mother's other children in proceedings following the hearing in this case, but that is not part of the appellate record here.

is home five to six nights a week. But Father is a commercial truck driver, and there is evidence that he sometimes is gone for several days and sometimes drives on the weekends. The photos of his parents on vacation with Child, with their description of Child as "the grandchild we are raising" lend support to the court's finding that "there is credible evidence" that he is not the primary caregiver. We note that the trial court did not expressly conclude that Father was not the primary caregiver, only that there was credible evidence that he was not.

As Father acknowledges in disputing Finding 7 that Mother's testimony is more credible than his, the trial-court factfinder resolves conflicts in the evidence and determines the weight and credibility to give witness testimony, and its decision on such matters is generally viewed as conclusive. *Schneider v. Schneider*, 5 S.W.3d 925, 931 (Tex. App.—Austin 1999, no pet.); *see also Lehman v. Lehman*, No. 03-19-00730-CV, 2021 WL 268482, at *4 n.8 (Tex. App.—Austin Jan. 27, 2021, pet. denied) (mem. op.). It is not our role to pass on the weight or credibility of the witnesses' testimony. *Schneider*, 5 S.W.3d at 931. We will not further address Father's arguments on this topic.

Father disputes Finding 8 that "[t]here is evidence that Father cannot nurture a relationship between [Child] and Mother and has shown her great disrespect." He specifically challenges Finding 8a that "the first indication of [Finding 8] are the months that he deprived Mother of seeing the child." Father testified that he and Mother rarely communicate and that they do so only to set up visitation, though they had used intermediaries for much of Child's life. He testified that he wanted Mother's visitation time to increase gradually up to a standard visitation schedule and that he believed they could be civil and make exchanges easy. Though Father justifies taking Child from Mother on April 13, 2019, because of the positive drug test for Mother and Child, he literally deprived Mother of possession of Child; Mother saw Child only

once between April and December 2019. Mother testified that his failures to update her on Child's condition caused her to report him to DFPS. Mother's sister testified that Father told her at one point that he wanted to keep Child away from Mother.

Father expressly does not dispute that subfindings 8b and 8c are "incidents of contentious action or speech." These subfindings include the February 2019 incident that led to police responding; his April 2019 taking of Child; the conversations he had with Mother's sister; and the critical recorded conversation from August 8, 2020 that occurred during a Mother-Child visitation with the children audible in the background. While Father may have different intentions for his actions in the future, we conclude that the record supports Finding 8.

Father disputes Finding 9 that "both parents have a troubled past" because it equates their past troubles. He argues that his criminal history predates Child's birth and is from the "distant" past, while Mother's troubles include arrest for possession of a controlled substance, Child testing positive for methamphetamine, and other children being removed from her care—all during the pendency of this SAPCR. He does not dispute the remainder of the factual finding regarding Mother's progress through new practices. Father's criminal history discussed at the hearing is from the most recent decade, including a charge for which he was sentenced in 2016 to a four-year period of probation that expired in 2020. Child was born in 2018. Finding 9 does not expressly equate the parents' troubles, but correctly observes that they both have troubled pasts. The record supports Finding 9.

Father disputes Conclusion 2a that "he does not give priority" to Child's welfare, arguing that he has acted in Child's best interest repeatedly. He also contends that he can reach shared decisions on Child's best interest and encourage a relationship between Mother and Child. The trial court's conclusion includes qualifiers that Father "has not *always* shown he can give

12

*first* priority to the child's welfare" or reach shared decisions on the child's best interest; we also note the trial court stated this sub-conclusion as a concern that it ultimately overcame in naming the parents joint managing conservators. While the record shows that Father has done both, the record supports the court's conclusion that he has not always done so during Child's entire life. Though he disputes the version of events, evidence that he drove himself and Mother (and possibly Child) while intoxicated from a 2018 family party is an instance of not giving priority to Child's welfare. Father's claims that he can encourage a positive relationship between Mother and Child are undercut by the conversation with Mother at her visit with Child eleven days before the hearing in this case. Conclusion 2a is supported by the record.

Father disputes Conclusion 2b that "both parents participated in rearing the child before and during the pendency of the case" because Child lived with him for sixteen of her twenty-four months of life, during which time Mother had very limited contact. Mother had sole possession of Child for the first eight months of Child's life with scant involvement or visitation of Father. That ratio switched after Father took Child from Mother's home, though Mother did visit Child during the latter stages of Father's possession. This conclusion is in support of the decision to appoint the parents joint managing conservators. Though the level of participation of the parents in rearing Child varied greatly, Conclusion 2b is supported by the record.

Father disputes Conclusion 3 that designating Mother to establish Child's primary residence is in Child's best interest. We will review this determination in greater depth below when applying the *Holley* factors. Among those factors is the subject of Conclusion 3a that Mother will provide a stable home for Child.

Father disputes Conclusion 3b that Mother is committed to nurturing a civil relationship with Father. He points to her actions such as excluding him from the birth—though

13

Mother testified that she did so because at the time he disputed that he was Child's father and accused her of drinking while pregnant. He complains that she made calls to DFPS with false accusations, but she testified that she was trying to get information about Child when he would not give her updates; once, she reported an unexplained gash on Child's back, which turned out to be from an accident on a slip-n-slide. Mother testified that Father was a good parent, and she agreed that Father should see Child. The record supports Conclusion 3b.

Father challenges Conclusion 3c that Mother "met" her legal challenges by working through the legal system, taking advantage of programs to resolve her cases, get sober, and become a more stable person. As discussed above regarding Finding 4, the record supports Conclusion 3c except to the extent that the past-tense "met" implies that the drug and DFPS cases were closed.

Father disputes Conclusion 3d that "[t]he same cannot be said of Father" apparently contrasting his actions with Mother's reform efforts. The Court states that it is not convinced that he would be the primary caretaker at his parents' home and concludes that Child's best interest is served by appointing a parent who will be the primary caretaker. Father contends that he was Child's primary caretaker for sixteen months before trial. He argues that his occasional overnight absences and the presence of other caretakers in his home does not diminish his role. This conclusion is based on the same evidence as Finding 6. Father and his parents testified that he is involved in Child's care when he is home, which is often five to six nights a week, but that he sometimes is gone for several days and sometimes drives on the weekends. This contrasts with Mother, who now lives on her own with her two other children, though her mother lives in the same town. The photos of Father's parents on vacation with Child, with their description of Child as "the grandchild we are raising" lend support to the

14

court's conclusion that Father might not have been Child's primary caretaker, at least as compared to Mother as she is currently caring for the older children.

Father disputes Conclusion 3e that he resorts to self-help instead of the legal process, and that Mother will more likely foster respect for the law and other persons and teach Child those values. He initiated the legal action in this case, including the initial paternity action and motions to modify. He argues that Mother's criminal charges, drug addiction, DFPS removal, and domestic violence in her home do not support the conclusion that she will more than likely foster respect for the law and other persons and teach the child those values. However, before filing this case, Father unequivocally took and retained Child without benefit of a court order for at least four months. His argument ignores or discounts his multiple criminal activities in the decade before Child was born and does not address his attitude toward Mother evident in the recorded conversation on August 8, 2020. Though both parents have legal issues in their pasts, Father's repeated violations over several years and Mother's steps to address her descent into addiction—while incomplete at the time of the hearing—support Conclusion 3e.

Father disputes Conclusion 4a(i), arguing that he did not inappropriately limit Mother's contact with Child. He argues that it is reasonable to assume that, if he had not removed Child, DFPS would have because of the positive drug test of Mother and Child; however, DFPS had not intervened a month after the drug test results. He notes that Mother did not take legal action to demand visitation for months and, when she did, they agreed to visitation. He contends that her failure to have more contact lies at her feet. However, it is undisputed that Father took Child from Mother's home in April 2019 without benefit of a court order and retained Child despite a subsequent written order giving Mother the right to designate the child's

residence.[6] Mother testified that, after initially allowing her FaceTime visits with Child, Father stopped allowing them over the summer of 2019. She testified that she went to Father's hometown with "court documents that we previously had and [we were] just told to go to Court," which is some attempt to exercise a right to contact. She testified that, after the September 2019 order allowing mutually agreed visits, Father allowed only one visit until they reached a new agreement in December 2019 calling for specified visits. The record supports the court's Conclusion 4a(i) that such limits were inappropriate.

**The *Holley* factors and the court's order regarding who determines the child's residence.**

We will examine the evidence on each of the non-exhaustive *Holley* factors to see how they guided the trial court's decision. In determining the best interest of a child, courts consider factors such as the following: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist the individual to promote the best interest of the child; (6) the plans for the child by the individual or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent, or potential conservator, that may indicate that the existing relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent or potential conservator. *Holley*, 544 S.W.2d at 371-72 (Tex. 1976); *Harris v. Texas Dep't of Fam. & Protective Servs.*, 228 S.W.3d 819, 836 (Tex. App.—Austin 2007, no pet.). "Proof of best interest is not limited to these factors, nor do all factors always

---

[6] DPFS's apparent acquiescence to Father's taking Child without benefit of a court order is not expressly explained in this record.

16

apply in every case." *In re S.A.H.*, 420 S.W.3d 911, 926 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Child was two years old at the time of the hearing and did not testify regarding her desires. Father contends that Child's desires are shown by Child's apparent apprehension at the outset of visits with Mother. He testified that Child talks about leaving before the visit begins and that he has to reassure her that the visit is okay because Mother is her mother. He testified that it takes fifteen to twenty minutes for Child to warm up and that he needs to be in Child's sightline, though she then runs up to him. Mother testified that Child runs up to her and smiles and that they had a good visit on August 8, 2020.

Father contends that he can better meet the emotional and physical needs of Child now and in the future because Child had lived with him for sixteen of the twenty-four months of her life. *See In re L.G.R.* 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (emphasizing child's need for permanence through stable home). Mother agrees that Child is doing well in his care. His parents both testified that moving to Mother's home would harm Child's mental and physical health. Mother contends that she met Child's needs before Father removed Child from her care. She asserts that Father's treatment of Mother in Child's presence undercuts the claim he can meet the Child's emotional and physical needs.

Father asserts that Mother's home presents emotional and physical dangers to Child now and in the future. He points to Mother's past drug use, Child's testing positive for methamphetamine along with Mother, the removal of her other children due to a domestic violence event between Mother and her mother, and Mother's need to take out a protective order against the ex-boyfriend who attended Child's birth. Father argues that the domestic violence creates a presumption that Mother should have restricted access to Child, not primary custody.

17

*See* Tex. Fam. Code § 153.004. Father notes that parental drug use supports a finding that a parent engages in conduct that endangers the physical and emotional well-being of children. *See In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *5 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.). Father denies that he has an alcohol problem; he denies that he got drunk and drove away from a family barbecue.

Mother contends that she has successfully dealt with her drug use, pointing to repeated negative tests and pending completion of the drug-court program. Mother's altercation was with her mother, not Child, and there was evidence that the altercation was triggered by her PCOS. Mother contends that Father's failure to deal with his alcohol issues contrasts with her successful participation in treatment programs for her drug use. Father has a criminal history that predates Child's birth; he completed a four-year probation term in 2020. Mother has participated in services that led DFPS to return her older children to her care under monitored return, which was set to conclude eight days after the hearing in this case. Mother contends that Father's attitude toward her is risky for Child's well-being and contradicts Texas policy to encourage frequent contact between a child and each parent. *See* Tex. Fam. Code § 153.251(b). Father's truck-driving job requires travel and working the occasional night, whereas Mother's convenience store job is in the town where she lives. Father lives with his parents who take on the child-care duties when his work requires him to be away from Child.

Father's parental abilities over his sixteen months of possession have helped Child do well. His parents testified that he is very involved with both of his children. He bathes and feeds Child, changes her diaper, and puts her to bed. Mother testified that he is a good dad. Maternal grandmother testified that Mother was a good parent before she began using drugs, which according to Mother began when Child was about six months old; Mother has had limited

18

contact with Child since Father removed her. Mother's other children were removed from her care but had been returned to her under monitoring for the six weeks before the hearing.

There is no evidence regarding programs available to help Father, but there is also no evidence that DFPS has ever intervened or assessed whether or how he needs assistance from such programs. Mother has used programs to help her parenting, and Child's court-appointed special advocate said Mother has done everything she was asked to do. Father argues, however, that there is a chance of recidivism or slippage in parenting performance when she is no longer closely monitored by DFPS. Mother argues that his concerns are pure speculation.

Evidence of specific plans for Child is scant and indirect. Father intended to continue with Child in his home but testified that he would be okay with Mother gradually increasing visitation up to a standard visitation order. If Mother was awarded the right to determine Child's residence, he wanted more than standard visitation because Child had been with him for so long. Mother wanted Child to spend more time with her other children and the rest of her family but agreed that Father should still see Child. Both parents acknowledged that they should work with each other for the Child's benefit.

Child lived with Father and his parents for sixteen months. Father had remained employed as a truck driver and changed jobs to work closer to home. Though Father sometimes works overnights, his mother works from home. Mother lived in the same house that Child was in for the first eight months of life, but the maternal grandmother had moved to another place in the same town. Mother and maternal grandmother had a "little altercation due to [Mother's] hormonal imbalance." Mother has not only undergone treatment for drug abuse, but has been treated for her PCOS which has reduced pain and hormonal fluctuations. Mother's home was

19

stable enough that DFPS returned her older children, albeit under monitoring. Mother had stayed with her job at the convenience store for a year—the longest she had held a job.

Father expressed concern about Mother's history of drug abuse recurring, the altercation with her mother, and whatever led to the protective order against the ex-boyfriend. Father also noted that Mother did not try sufficiently hard to get visitation during the first months after he took Child. Mother responds that she traveled to his hometown but was turned away, got a court order in September 2019 permitting her agreed visitation but was allowed only one visit, then reached an agreement in December 2019 to a set visitation schedule. Mother expressed concern that Father "badmouths" her in front of Child and has restricted her visitation without a court order. Father contends that he has acted to protect Child from the mother who exposed her to methamphetamine. Mother testified that she used drugs while in a spiral from postpartum depression and pain and hormone imbalances from PCOS but has obtained successful treatments for all three conditions.

In sum, the trial court had adequate evidence to decide with the record in this case being both mixed on some factors and thin on others. Viewing the record through the lenses of the legal-sufficiency and factual-sufficiency standards of review, we found that the record did not support findings and conclusions that Mother had completed her drug-court and DFPS-case obligations or that Father had a problem with alcohol in 2020. However, viewing the record as a whole, we cannot say that the trial court abused its discretion by awarding Mother the exclusive right to establish the child's residence, particularly because the court mitigated the risk to the Child of an abrupt change in primary residence; the court ordered that the Child alternate weeks residing with Mother and Father for four months before making Mother's home the primary residence. Because some evidence of a substantive and probative character exists to support the

trial court's decision, we must conclude that the trial court did not abuse its discretion. *See*

*Echols*, 85 S.W.3d at 477.

## CONCLUSION

We affirm the trial court's order.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Baker and Smith

Affirmed

Filed: November 3, 2021